(No. 63747.—

THE PEOPLE *ex rel.* NEIL F. HARTIGAN, Attorney General, *et al.*, Appellees, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Appellants.

*Opinion filed June 16, 1987.*

124

GOLDENHERSH and SIMON, JJ., took no part.

Neil F. Hartigan, Attorney General, of Springfield (Hercules F. Bolos, Thomas J. Russell and Allen C. Wesolowski, Special Assistant Attorneys General, of Chicago), for appellant Illinois Commerce Commission.

Isham, Lincoln & Beale (Richard G. Ferguson, Michael I. Miller and Paul F. Hanzlik, of counsel), and Kevin M. Forde, Ltd. (Kevin M. Forde and Katrina Veerhusen, of counsel), of Chicago, for appellant Commonwealth Edison Company.

Neil F. Hartigan, Attorney General of Springfield, and Richard M. Daley, State's Attorney, of Chicago (John W. McCaffrey, Mark N. Jason, Rosalyn B. Kaplan, William J. Herrmann, David A. Gilbert and James S. Montana, Jr., Assistant Attorneys General, of Chicago, and Patrick N. Giordano, Assistant State's Attorney, of counsel), for the People.

Judson H. Minor and Dodge Wells, Corporation Counsel, of Chicago, for appellee City of Chicago.

Allen W. Cherry, of Chicago, for appellee Community Action for Fair Utility Practice.

Randall Robertson and Edward C. Fitzhenry, of Lueders, Robertson & Konzen, of Granite City, for appellee Illinois Industrial Energy Consumers.

Jenner & Block, of Chicago (Alexander Polikoff, Howard A. Learner, Robert L. Graham, Norman M. Hirsch, Howard A. Simon, Stuart Gimbel, and Deborah A. Dobish, of counsel), for appellees Business and Professional People for the Public Interest *et al.*

Jeffrey C. Paulson and Stefan H. Krieger, of Chicago, for appellee South Austin Coalition Community Council.

Morris I. Leibman, Howard J. Trienens, David W.

Carpenter and Laura L. Leonard, of Sidley & Austin, of Chicago, for *amicus curiae* General Employees' Retirement Trust of the YMCA of Metropolitan Chicago *et al.*

William G. Shepherd, of Chicago, for *amicus curiae* Small Business Utility Advocate.

Stephen J. Moore, Nicala R. Carter and Thomas H. Rowland, of Chicago, for *amicus curiae* Office of Public Counsel.

JUSTICE MILLER delivered the opinion of the court:

In October 1985 Commonwealth Edison Company (Edison) was granted a rate increase by the Illinois Commerce Commission (the Commission). The Commission's order, with three Commissioners dissenting, disallowed a relatively small percentage of the rate increase requested by Edison. A number of intervenors opposing the rate increase appealed the Commission's order to the circuit court of Cook County, which consolidated the intervenors' appeals. Finding that the audit relied upon by the Commission in evaluating the rate increase did not comply with section 30.1 of the Public Utilities Act (Ill. Rev. Stat., 1985 Supp., ch. 111⅔, par. 30.1), the circuit court ordered the Commission to conduct a new rate-making proceeding. The court also instructed the Commission to disallow all or part of certain expenses that Edison sought to include in its new rate base. The Commission and Edison appealed the circuit court's order to the appellate court. The intervenors, however, petitioned for leave to appeal directly to this court, pursuant to Rule 302(b) (103 Ill. 2d R. 302(b)), and we allowed the request for a direct appeal.

Edison filed a two-stage rate increase request with the Commission in October 1983. In the rate request, Edison sought to include in its rate base the costs of

construction of Unit 1 of Edison's nuclear power plant near Byron, Illinois (Byron 1), which was approaching completion. Seventeen organizations and associations filed briefs with the Commission as intervenors. Following the Atomic Safety Licensing Board's denial of an operating license for Byron 1 in January 1984, the Commission appointed a committee to recommend an auditor to conduct an audit of the costs associated with the construction of Byron 1. The Commission subsequently approved the hiring of Arthur D. Little, Inc. (ADL), to conduct the audit. The Commission determined that the audit should comply with House Bill 2615 (codified as Ill. Rev. Stat., 1985 Supp., ch. 111⅔, par. 30.1, effective January 22, 1985), which had recently passed both houses of the General Assembly and was then awaiting the Governor's signature; the Commission ordered its staff to supervise the performance of the audit.

ADL submitted its audit report to the Commission during March 1985, and the authors of the report were cross-examined at Commission hearings on the report during late April and early May 1985. Although the intervenors claimed that ADL's audit was deficient under section 30.1, the Commission's hearing officer denied intervenors' motion to suspend the hearings to improve the audit.

During July 1985, the Commission held trial-type hearings on the rate request. Both Edison and the intervenors presented the testimony of a number of experts concerning the audit and the proposed increase. On October 24, 1985, the Commission issued its order granting Edison an annual rate increase of $494.8 million; this amount reflects Edison's costs of over $2 billion incurred in the construction of Byron 1, minus $101.5 million that the Commission excluded from the rate base. The Commission excluded the $101.5 million from the utility's new rate base because the Commission found that Edi-

son was responsible for one-half of the costs of the delay in obtaining an operating license from the Atomic Safety Licensing Board. Two Commissioners joined in a written dissent criticizing the audit report and the majority's finding that virtually all Byron 1 costs were reasonable. A third Commissioner dissented without opinion.

Twelve of the intervenors appealed the Commission's order to the circuit court of Cook County. The circuit court consolidated the appeals. After considering the record, the briefs, and extended oral argument, the circuit court reversed the Commission order and remanded the cause to the Commission for a new ratemaking proceeding. In a lengthy written opinion, the court found, as a matter of law, that the ADL audit report of Byron 1 had not been conducted under "generally accepted auditing standards" as required by section 30.1 of the Public Utilities Act (Ill. Rev. Stat., 1985 Supp., ch. 111⅔, par. 30.1) and that the Commission's interpretation of the term "generally accepted auditing standards" was clearly erroneous. The court also ruled that the Commission had improperly placed the burden of proof with the intervenors to show that Edison's costs were unreasonable, rather than requiring Edison to prove that the costs were reasonable. The court declared that section 30.1, rather than allowing the exclusion of costs from rate base when the costs were proved unreasonable, prohibited the Commission from including costs in a utility's rate base until the utility established that the costs were reasonable. The court also found that the Commission's allowance of one-half of the costs related to the delay in obtaining an operating license into the rate base of Byron 1, and the allowance of 100% of the costs of the physical plant common to Byron Units 1 and 2, was contrary to the manifest weight of the evidence. The court ordered the Commission to exclude from the rate base all the costs of the licensing delay and ordered the Com-

mission to exclude some portion of the costs of the plant common to Byron 1 and 2 from the costs of Byron 1. The court instructed the Commission to roll back the $494.8 million annual rate increase ordered by the Commission in October 1985 and to set revised rates for Edison within 30 days. The court ruled that none of the costs incurred in the construction of Byron 1 could be included in the revised rates; apparently, the revised rates were to remain in effect until the Commission considered, in further proceedings, which of Byron 1's costs could be included in Edison's rate base.

Section 30.1 of the Public Utilities Act provides in part:

"The cost of new electric utility generating plants and significant additions to electric utility generating plants shall not be included in the rate base of any utility unless such cost is reasonable. Prior to including the cost of plants or additions to utility plants in the rate base, the Commission shall conduct an audit of such costs in order to ascertain whether the cost associated with the new generating plant *** is reasonable. If the Commission is unable to conduct such an audit, the Commission shall arrange for it to be conducted by persons independent of the utility and selected by the Commission. *** Any such audit shall be conducted in accordance with generally accepted auditing standards and shall include but not be limited to costs associated with materials, labor, equipment, professional services and other direct and interest costs." (Ill. Rev. Stat., 1985 Supp., ch. 111⅔, par. 30.1.)

Section 30.1 also defines "reasonable," and it provides that in determining the reasonableness of costs the Commission is to consider "the knowledge and circumstances prevailing at the time of each relevant utility decision or action."

Effective January 1, 1986, subsequent to the date of the Commission order in the case before us, Public Acts 84—617 and 84—1025 substantially revised and restruc-

tured the Public Utilities Act (Ill. Rev. Stat. 1985, ch. 111⅔, pars. 1—101 through 11—302). The statute as amended expressly provides, however, that it does not affect actions pending at the time the amendments took effect. (Ill. Rev. Stat. 1985, ch. 111⅔, par. 4—402.) Although section 30.1 of the former statute has been renumbered as section 9—213 of the amended act, its language has not been altered except in referring to another similarly renumbered section. For purposes of this appeal, we shall refer to the statute as section 30.1.

The Commission and Edison now suggest that section 30.1 does not apply to the present case because it became effective January 22, 1985, after the audit had begun and some evidence of construction costs had been presented. The circuit court noted the question, but found that it was not presented—no party had raised the issue, and the parties had briefed and argued the case in that court as if section 30.1 applied.

By not contesting the applicability of section 30.1 in the circuit court, the Commission and Edison waived any challenge in this court to the application of the statute. Failure to raise an issue in the trial court waives the issue for purposes of appeal. (See, *e.g., Shell Oil Co. v. Department of Revenue* (1983), 95 Ill. 2d 541.) We note further that it is not unfair to apply section 30.1 to the instant proceeding, since the proceedings were conducted with section 30.1 in mind and the Commission had advised the parties and ADL that the audit was to comport with the requirements of House Bill 2615 (subsequently codified as section 30.1). We conclude that section 30.1 governs the instant case.

### I. Burden of Proof Under Section 30.1

Noting that intervening events caused drastic increases in Edison's 1972 estimates of the time required to complete Byron and the project's total cost, the Com-

mission identified the principal issue in the case as "whether any part of the cost of Byron 1 should be excluded from Edison's rate base." The Commission dissenters, however, submitted that the majority had adopted the wrong approach in setting Edison's rate base under section 30.1; they contended that, rather than excluding from the total amount submitted by Edison only those costs proved to be unreasonable, the Commission could allow costs to be included in rate base under section 30.1 only when the costs were proved to be reasonable. The circuit court agreed with the Commission dissenters and ruled that the majority had improperly presumed the reasonableness of Edison's costs.

Edison points out that before section 30.1 was enacted, costs incurred by a utility were presumed to be reasonable (see, *e.g., City of Chicago v. Illinois Commerce Com.* (1985), 133 Ill. App. 3d 435, 442-43), and Edison argues that the enactment of section 30.1 did not eliminate that presumption. The Commission majority agreed with Edison that the historic presumption of reasonableness had survived the enactment of section 30.1. The majority believed that once a utility demonstrated the amounts that it had actually invested in the construction of a power plant, the investment was presumed to have been reasonable and the Commission was powerless to deny recovery of those costs unless there was some showing that they were unreasonably incurred.

Section 30.1 provides that the costs associated with the construction of a power plant may not be included in a utility's rate base unless they are reasonable; under the statute, an audit is to form the basis for that determination. The audit is to be conducted by the Commission or, if the Commission is unable to do so, by persons independent of the utility who are selected by the Commission. The cost of the audit is to be borne initially by the utility but may later be recovered through normal

ratemaking procedures. By providing a scheme by which the reasonableness of construction costs may be determined, the legislature has removed any need for the presumption of reasonableness that may have existed when the Commission had no comprehensive vehicle for examining costs.

Moreover, we note that the legislative history of section 30.1 suggests that an affirmative showing of the reasonableness of a utility's construction-related costs is necessary if a sense of confidence in the ratemaking process is to be instilled in those consumers who are required to pay the increased rates resulting from those costs. (83d Ill. Gen. Assem., House Proceedings, May 10, 1984, at 154-55 (Statement of Representative Richard H. Brummer, House sponsor).) The mere presentation by a utility of the costs it incurred in building a power plant, potentially an overwhelming sum, does not engender in others a sense of confidence that the costs were reasonable. Nor would consumers' concerns about the costs involved in the construction of a power plant be overcome if the Commission presumed that the amounts expended by a utility on the new facility were reasonable.

We therefore conclude that the audit required by section 30.1 has replaced the presumption of reasonableness. Under the statute, the audit now provides the primary means by which the Commission is to determine the reasonableness of the costs associated with the construction of power plants.

The audit need not be the only means, however, by which the Commission determines the reasonableness of construction costs. If the audit is deficient in some respect, or if the Commission, its staff, or intervenors throw into doubt the reasonableness of the costs incurred in the construction of the plant, the Commission may order a supplemental audit, take affirmative evidence concerning the reasonableness of the costs, or

deny the costs altogether if they are not shown to be reasonable. The fundamental, underlying value is that all costs incurred by a utility in the construction of a plant shown to be reasonable are to be included in the utility's rate base and that all costs not shown to be reasonable by the audit report or by affirmative evidence from other sources are not to be included in the rate base. Only when the Commission is satisfied by the audit report or by other affirmative evidence that the costs incurred by a utility in the construction of a plant are reasonable may those costs be included in the utility's rate base.

In the case before us, numerous questions were raised by the audit and by the intervenors concerning the reasonableness of the costs associated with the construction of Byron 1. In most instances, the Commission allowed the questioned costs into the rate base because they had not been proved to be unreasonable. For example, the Commission order recites that certain costs, such as architectural and engineering fees and certain expenses related to productivity, were not excluded from the rate base because the intervenors had not proved that those costs were unreasonable. Also, the Commission apparently allowed substantial costs of preoperational testing and rework into the rate base without first determining from the audit report or other affirmative evidence whether the costs incurred were reasonable.

Furthermore, the audit report was critical of the size of Edison's workforce and of the company's oversight of productivity; the intervenors also questioned whether Edison had overextended its workforce. Yet the Commission said that Edison responded to the audit's concerns and that the intervenors had failed to prove that Edison had managed its workforce imprudently. The Commission determined that the specific questions of unreasonableness had been rebutted but made no finding that

Edison had presented affirmative evidence to show that the costs were reasonable. The Commission found "no basis in this record to disallow any part of Byron's cost based on these issues" and included the costs in the rate base.

The Commission's approach of excluding costs from the rate base only if they were proved to be unreasonable is suggested by its statement that "[t]he audit report was prompted by the desire to determine whether any of these increases should be disallowed." The purpose of the audit, however, is to assist the Commission in determining whether the costs of constructing a plant were reasonable and should therefore be allowed into the utility's rate base.

Furthermore, under the comprehensive scheme set out in the Public Utilities Act, the Commission is to be an active participant. The Commission is not merely an arbitrator between a utility seeking a rate increase and any parties who happen to oppose it. Rather, the Commission is an investigator and regulator of the utilities, and under section 30.1 it may not rely on intervening parties to contest a rate increase or to challenge the evidence offered by the utility.

Nothing in the Public Utilities Act requires any party other than the Commission and the utility seeking a rate increase to participate in a ratemaking proceeding. Thus, any participation by persons or groups opposing an increase is voluntary and purely fortuitous. It is possible that no person or entity will seek to intervene when a rate increase is sought; in other cases, those who intervene may lack the financial resources or the incentive to launch a vigorous challenge to all aspects of the increase. (See *Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Com.* (D.C. Cir. 1971), 449 F.2d 1109, 1118.) Requiring intervenors to establish unreasonableness is therefore no substitute for requiring proof of

reasonableness. The difference is significant. In the case before us, in determining the reasonableness of the costs associated with the construction of Byron 1, it is apparent that in many instances the Commission relied on the now impermissible practice that costs are presumed to be reasonable once the utility has established the amount.

Because the Commission relied on the presumption of reasonableness, rather than an affirmative showing of reasonableness through the audit performed by ADL and specific evidence of reasonableness, the cause must be remanded to the Commission. Although it is possible for this court to examine the record to independently determine whether sufficient evidence of the reasonableness of the costs associated with the construction of Byron 1 has been presented through the audit report or otherwise, the Commission has been charged by the legislature with making that determination in the first instance. (See *Illinois Power Co. v. Illinois Commerce Com.* (1986), 111 Ill. 2d 505.) In determining on remand whether sufficient evidence of reasonableness has been presented, the Commission may consider the present record in the light of the requirements of section 30.1 as expressed in this opinion, or require the presentation of such further evidence as may be necessary for it to make a proper determination.

## II. Generally Accepted Auditing Standards Under Section 30.1

The requirement that the Commission either conduct, or arrange to have conducted, an audit of the costs of new utility generating plants is central to ascertaining reasonableness under section 30.1. The audit is to be conducted in accordance with generally accepted auditing standards. (Ill. Rev. Stat., 1985 Supp., ch. 111$^{2/3}$, par. 30.1.) After considering evidence presented as to ap-

propriate auditing standards in the present case, the Commission ruled that no specific set of written standards directly governed the type of audit mandated by section 30.1. The Commission stated that it was "of the opinion that the reference to 'generally accepted auditing standards' in the statute is simply a spelling out of the implicit requirement of professional competence in the auditor, both in its abilities and its performance." The circuit court ruled that the Commission's interpretation of section 30.1 was incorrect as a matter of law.

Edison and the Commission contend that the Commission's interpretation of the phrase "generally accepted auditing standards" is a question of fact that cannot be reversed unless contrary to the manifest weight of the evidence. (See *Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Com.* (1960), 19 Ill. 2d 436, 442; Ill. Rev. Stat. 1983, ch. 111⅔, par. 72.) The intervenors maintain that the Commission's interpretation is a question of law which is not binding upon the courts. (See *Winakor v. Annunzio* (1951), 409 Ill. 236, 248.) We find that, regardless of whether the meaning of "generally accepted auditing standards" is identified as a legal or a factual question, the Commission's interpretation of the generally accepted auditing standards requirement in section 30.1 is erroneous under the evidence presented.

After receiving a great deal of evidence as to what comprised generally accepted auditing standards, the Commission formulated its own interpretation of the generally accepted auditing standards requirement in section 30.1 as an implicit requirement of professional competence in the ability and performance of the auditor. The Commission's interpretation fails to acknowledge the evidence introduced by the parties. The expert witnesses agreed that no single written set of generally accepted auditing standards exists which apply specifically to the type of audits mandated by section 30.1. Edi-

son and the intervenors presented complementary evidence, however, of a number of similar standards which applied to the audit conducted by ADL. At least two witnesses, one of them presented by Edison, testified that *Standards For Audit of Government Organizations, Programs, Activities and Functions* (rev. ed. 1981) (commonly known as the Yellow Book), published by the United States Comptroller General, generally applied to the ADL audit.

Elmer Staats, Comptroller General at the time the Yellow Book was published, testified in behalf of Edison that applicable Yellow Book standards include the proficiency of the auditors and due care in conducting the audit. These standards mirror those identified by the Commission. Staats further testified, however, that other Yellow Book standards applicable to the type of audit conducted by ADL include auditor independence, lack of impairment of the audit effort, adequate planning, sufficient and competent evidence to support the auditor's judgment and conclusions, and auditor inquiry into a number of specified areas. The Commission's interpretation ignored these additional requirements. No party presented evidence or argued that Staats' statement of applicable standards was incorrect.

Edison's other audit witness submitted that a general consensus exists as to standards governing audits of the type conducted by ADL, and that the Yellow Book reflects these standards. This witness indicated that Yellow Book standards that apply to the ADL audit include requirements of integrity and consistency in the audit, as well as auditor expertise; these standards are similar to the Commission's interpretation of "generally accepted auditing standards." Also necessary in the opinion of this witness, however, were auditor independence, proper scope and planning of the audit, adequate evidence to support conclusions reached, and proper com-

munication among the audit team, the entity being audited, and the regulatory body requesting the audit.

The intervenors' witnesses identified standards applicable to the ADL audit similar to those cited by Edison's witnesses; this testimony is consistent with the intervenors' position that the Yellow Book standards apply here. Witnesses from ADL, the audit firm in the present case, were unfamiliar with the Yellow Book. The ADL witnesses therefore did not state that the Yellow Book standards did not apply, nor did they testify that any other standards offered by Edison or the intervenors did not apply; they stated instead that they had been influenced by standards promulgated by the New York Public Services Commission.

Because the Commission's interpretation of the generally accepted auditing standards requirement included only two of the factors identified by the audit witnesses of Edison and the intervenors and ignores other standards the witnesses identified as applicable, we find that the Commission's interpretation of "generally accepted auditing standards" is against the manifest weight of the evidence.

Furthermore, professional competence in ability and performance would be required of an auditor even if the requirement of generally accepted auditing standards was not in section 30.1. Certainly an audit would be inadequate if conducted with less than professional competence in either the auditor's overall ability or his performance with respect to that particular audit. The reference to generally accepted auditing standards, then, must require something more than professional competence; otherwise, the language regarding "generally accepted auditing standards" would be rendered superfluous. There is a strong presumption against finding statutory language to be mere surplusage (*Arnold v.*

*Board of Trustees* (1981), 84 Ill. 2d 57), and nothing suggests that we should do so here.

It is not important that the auditor, here ADL, was unaware of one set of standards or another. It is possible that an audit could be conducted properly without the auditor's identifying any specific set of standards under which it operates. It is important, however, that the Commission review the audit in light of some identifiable, generally accepted auditing standards. This assures that the audit was sufficient, measured against a generally accepted standard, and that the Commission properly performed its review function. The result is an audit that enables the Commission to determine whether a utility's costs are reasonable and can be included in its rate base. In addition, by identifying generally accepted auditing standards applicable to the audit, the Commission facilitates review of its decision by providing an objective and identifiable benchmark against which the court can measure the audit. Although it is within the Commission's province to accept evidence and to determine appropriate standards against which to measure the audit, it is within the power of the court to determine from the evidence on review whether the audit complies with the standards identified.

Because the Commission, in its order, defined an improper standard against which to measure the audit, neither the Commission nor the circuit court here could properly determine whether the auditors sufficiently performed their audit function when measured against a proper standard.

The expert witnesses presented by the litigants disagreed about the sufficiency of the audit under the generally accepted auditing standards that the witnesses identified. Our examination of the audit report reveals some areas in which the audit might have been improved. But, the expertise and evidence-taking function

of the Commission is necessary to determine whether these deficiencies—if, indeed, they are deficiencies—render the audit insufficient under generally accepted auditing standards. It is for the Commission to determine proper standards against which to measure the audit and to then determine whether these standards were met in the present case.

The record on appeal contains extensive evidence concerning the audit standards that apply to the type of audit required by section 30.1. On remand, the Commission may determine from the evidence presented which, if any, of those standards meet the generally accepted auditing standards requirement contained in section 30.1, or the Commission may require further evidence of standards in order to make that determination. Once the proper standards are identified, the Commission must determine from the evidence that has been presented, or from further evidence, whether the ADL audit met those standards.

### III. Validity of Circuit Court Instructions

In reversing the Commission's order and remanding the cause, the circuit court instructed the Commission to promulgate new rates for Edison within 30 days, with the $494.8 million increase "rolled back" and the cost of the new Byron 1 plant excluded from the rate base; apparently the Commission was then to conduct a full and proper ratemaking proceeding to arrive at a new rate base. Also, the court instructed the Commission not to allow into the rate base any cost attributable to delays from quality control or quality assurance deficiencies at Byron 1, the court having concluded that Edison was responsible either directly or indirectly for all the delay costs resulting from those deficiencies. Finally, the court ordered the Commission not to attribute to Byron 1 the entire cost of the physical plant common to units 1 and

2. The Commission and Edison challenge these instructions as improper judicial ratemaking and as usurping the Commission's fact-finding function.

Setting utility rates is a legislative rather than a judicial function. (*Illinois Bell Telephone Co. v. Illinois Commerce Com.* (1973), 55 Ill. 2d 461; *Illinois Central R.R. Co. v. Illinois Commerce Com.* (1944), 387 Ill. 256, 275.) In the ratemaking scheme, the Commission and not the court is the fact-finding body. (*Illinois Commerce Com. v. New York Central R.R. Co.* (1947), 398 Ill. 11, 16.) Apart from examining whether the Commission acted within the scope of its authority or infringed upon a constitutional right, a court is limited to reviewing whether the Commission set out findings of fact supporting its decision and whether the findings are against the manifest weight of the evidence. (See *Cerro Copper Products v. Illinois Commerce Com.* (1980), 83 Ill. 2d 364.) Even when a court holds that rates authorized by the Commission are illegal, the court cannot make new rates. *Illinois Central R.R. Co. v. Illinois Commerce Com.* (1944), 387 Ill. 256, 276.

Under the Public Utilities Act, a court reviewing a Commission order has three options: the court may affirm the Commission's order, it may reverse the order, or it may remand the cause to the Commission to receive new or additional evidence. (See *Thompson v. Illinois Commerce Com.* (1953), 1 Ill. 2d 350, 358-59; Ill. Rev. Stat. 1983, ch. 111⅔, par. 72.) The reviewing court does not have the power to direct the Commission to take specific action. (*Thompson v. Illinois Commerce Com.* (1953), 1 Ill. 2d 350, 358-59; *Allied Delivery System, Inc. v. Illinois Commerce Com.* (1981), 93 Ill. App. 3d 656, 669.) If the evidence does not support the Commission's order, the court is limited to setting aside the order as against the manifest weight of the evidence or remanding for additional evidence. When the Commission's or-

der is set aside or remanded, the Commission may accept additional evidence, reevaluate the evidence already presented, or simply reverse its original determination. A revised rate order may then again be subject to judicial review to ascertain whether the Commission's new conclusions are supported by sufficient evidence.

The intervenors note that remanding a cause for further Commission proceedings consistent with the court's order is permissible. (*Illinois Bell Telephone Co. v. Illinois Commerce Com.* (1973), 55 Ill. 2d 461; *Chicago & Eastern Illinois Ry. Co. v. Commerce Com.* (1931), 343 Ill. 117.) The court's authority to remand for further action consistent with the court's opinion is not unlimited, however. The test is whether the court, through its opinion or order, limits or encroaches on the Commission's discretion in its ratemaking function. If the court's directive prohibits the Commission from considering or taking certain action in setting rates otherwise within the lawful scope of the Commission's authority, the court has engaged in judicial ratemaking and has acted improperly.

In its order, the Commission found that defects in the quality assurance/quality control program at Byron 1 resulted in a nine-month delay in the completion of the plant, at a cost of $203 million. The Commission found that the delay occasioned by two of the contractors at the Byron project was reasonably avoidable by Edison and that the cost of this delay should not be included in the rate base. The Commission stated that, at its best estimate, the two contractors under Edison's control were responsible for one-half of the nine-month delay; the Commission found that the remaining aspects of the quality assurance reinspection program and resulting delay costs were normal and reasonable costs of construction and not the result of imprudence or mismanagement on Edison's part. The Commission concluded that one-

half of the delay costs, or $101.5 million, should be excluded from the rate base.

The circuit court believed that all the delay costs should have been excluded and that allowing into the rate base half the costs of the quality control delay was contrary to the manifest weight of the evidence. The court concluded that Edison and the contractors were indistinguishable for purposes of plant costs analysis and found that Edison was responsible for the entire cost of the delay. The court instructed the Commission not to allow any costs of Byron 1 resulting from the delay into the rate base.

The circuit court was within its authority in concluding that the evidence did not support the Commission's finding that one-half of the delay expense was reasonable; the court went beyond its authority, however, in directing the Commission not to allow any delay costs in the rate base.

While it appears certain, as the Commission found, that a part of the delay costs was attributable to two of Edison's contractors, Hatfield Electric Company and Systems Control Corporation, and that Edison through imprudence shared in the responsibility for the failure of their quality assurance/quality control (QA/QC) programs, it is equally certain that some parts of the delay costs were attributable to the failure of the QA/QC programs of other contractors. Though Edison had the responsibility of ensuring that each of its contractors complied with the QA/QC requirements of the Nuclear Regulatory Commission, it does not follow, as the circuit court found, that Edison's imprudence in supervising the QA/QC programs of two of its contractors necessarily meant that Edison was imprudent in supervising the others, even though others besides Hatfield and Systems Control might have encountered problems with their separate programs. The Commission found that Edison was

imprudent in its supervision of Hatfield and Systems Control but not in the supervision of the others, and we cannot say from the evidence presented that the Commission finding in this respect was against the manifest weight of the evidence.

The Commission, however, found in its order that "as its best estimate" Hatfield and Systems Control were responsible for half the total costs and therefore excluded half the delay costs from Edison's rate base, allowing the remaining half to be included. Because the exclusion of half the delay costs from the rate base and the inclusion of the remaining half were based on the Commission's "best estimate" of the delay costs attributable to each and not on the audit report or other evidence, we find that the Commission's conclusion in this regard is arbitrary and not supported by the evidence.

In doing so we are mindful that it may be difficult to determine with any certainty which of the delay costs are attributable to Hatfield and Systems Control, the two contractors for whom the Commission held Edison responsible, and which of the costs are attributable to the others. While the Commission has broad discretion in ratemaking cases and its findings will not be disturbed unless they are against the manifest weight of the evidence, its factual findings must still be based on the evidence.

Because the Commission on remand has the discretion to accept additional evidence on the question of apportioning costs between that part of the delay the Commission found to have been caused by Edison's imprudence and that part of the delay the Commission found not to have been caused by Edison's imprudence, the circuit court's instruction not to allow any delay costs in the rate base proscribes the Commission's discretion in the ratemaking field and impermissibly usurps the Commission's ratemaking function. The circuit

court's instruction to the Commission not to allow any delay costs in the rate base was therefore beyond the court's authority.

We have previously determined that the Commission included costs of Byron 1 in Edison's rate base when the costs were not proved unreasonable, rather than, as section 30.1 requires, after a showing of reasonableness; we find it appropriate, therefore, for the Commission to consider, on remand, whether the record contains sufficient evidence to establish that any delay costs allowed by the Commission are reasonable.

In finding No. 10 of its order, the Commission said that the entire physical plant common to Byron 1 and 2 was used and useful because all the common plant facilities were used by unit 1 in generating electricity. The Commission therefore concluded that all the costs of the plant common to both units should be included in the rate base. The circuit court disagreed, finding instead that the inclusion of the entire cost of the common plant in the rate base attributable to Byron 1 was arbitrary and unreasonable. The court therefore directed the Commission to allow less than 100% of the costs of the common plant in Edison's rate base.

Whether all or only a part of the cost of the common plant should be charged as an expense of Byron 1, however, is a matter properly within the Commission's ratemaking discretion, and one that requires the Commission's expertise. Although some public utility commissions considering the issue have refused to allow all the common plant costs into the rate base when the first generating unit of a multiple-unit plant begins operation (see *Washington Utilities & Transportation Com. v. Pacific Power & Light Co.* (Wash. U.T.C. 1984), 60 P.U.R.4th 188; *Pennsylvania Public Utility Com. v. Duquesne Light Co.* (Pa. P.U.C. 1981), 43 P.U.R.4th 27), we find persuasive the authority that supports the Commis-

sion's inclusion of all the common plant costs into the costs of the first generating unit (*Re Duke Power Co.* (N.C.U.C. 1985), 69 P.U.R.4th 375). It is for the Commission to determine whether the particular facts of each case warrant immediate inclusion in the rate base of all the costs of the common plant.

In the present case, the parties presented conflicting evidence regarding whether all the common plant costs should be included in the rate base of Byron 1. The intervenors' witness supported attributing the costs equally to units 1 and 2; Edison's witness was of the opinion that, because unit 1 has used all the common facilities in generating power, the entire common plant should be included in the rate base. In including all the common plant costs in the rate base, the Commission considered and rejected the recommendation made by the intervenors' witness to divide the costs between the units. The circuit court, however, did not rely upon evidence in the record in reversing the Commission's determination but rather substituted its own judgment whether all common plant costs should be included in the rate base of the first generating unit. Ratemaking is within the province of the Commission and not the court, and the court may not substitute its interpretation of the evidence for that of the Commission (see *Illinois Bell Telephone Co. v. Illinois Commerce Com.* (1973), 55 Ill. 2d 461). But because of our determination that the Commission did not in each instance require an affirmative showing of reasonableness before allowing costs into the rate base, the Commission must reexamine the evidence to determine whether the costs of the common plant have been shown to be reasonable before the costs of the common plant may be included in Edison's rate base.

The Commission and Edison contend that the circuit court's first instruction, which directed the Commission to order new rates "rolling back" the $494.8 million in-

crease within 30 days, was beyond the court's power. We agree. As stated above, a circuit court reviewing an order of the Commission may only affirm or reverse the order or remand the cause for further evidence. Directing the Commission to establish a specific rate is judicial ratemaking, a function that the legislature has charged to the Commission exclusively. The court had no authority to order a rollback, or return, to the prior rates. (*Illinois Commerce Com. v. Chicago & Eastern Illinois Ry. Co.* (1928), 332 Ill. 243.) Moreover, the court may not impose a time limit within which the Commission, an agency created by the legislature, must perform its ratemaking function.

We must next determine what rate the utility should charge while the Commission conducts a new ratemaking proceeding and establishes a new rate schedule. In *Independent Voters of Illinois v. Illinois Commerce Com.* (1987), 117 Ill. 2d 90, this court stated that, following the reversal of rates ordered by the Commission, the utility could continue to charge the rate approved by the Commission. The utility, however, is subject to ratepayers' claims for reparations for excessive rates collected from the time of this court's reversal through the time new rates are approved by the Commission.

In the present case, the trial judge, upon Edison's motion, allowed Edison to collect the rate ordered by the Commission in its October 1985 order but ordered the amount collected over and above the rate previously charged by the utility to be held in escrow, subject to ratepayers' refund claims. As discussed, refunds dating from the circuit court's reversal are allowable under our decision in *Independent Voters*, if the Commission on remand determines that the rate base established by the Commission in its October 1985 rate order was based upon costs that were unreasonable.

For the reasons stated, the order of the circuit court of Cook County setting aside the Commission's October 1985 order is affirmed in part, reversed in part, and remanded to the Commission to conduct further ratemaking proceedings consistent with our opinion.

*Affirmed in part, and reversed in part, and remanded.*

GOLDENHERSH and SIMON, JJ., took no part in the consideration or decision of this case.