MARGARET GERNAND *et al.*, as Trustees of the Loren L. Wyman Revocable Trust, Petitioners-Appellants, v. ILLINOIS COMMERCE COMMISSION, Respondent-Appellee (Inter-State Water Company, now Consumers Illinois Water Company, Respondent-Appellee).

Fourth District    No. 4—96—0663

Argued January 21, 1996.—Opinion filed March 5, 1997.

Charles C. Hall (argued), of Welsch & Hall, of Danville, and Duane D. Young, of LaBarre, Young & Dietrich, of Springfield, for petitioners.

John P. Kelliher (argued), Special Assistant Attorney General, of Chicago, for respondent Illinois Commerce Commission.

Boyd J. Springer (argued), Karl B. Anderson, and Anastasia Katinas, all of Jones, Day, Reavis & Pogue, of Chicago, for respondent Consumers Illinois Water Company.

JUSTICE GREEN delivered the opinion of the court:

On June 1, 1995, respondent, Inter-State Water Company, now Consumers Illinois Water Company (CIWC), filed a petition with respondent, the Illinois Commerce Commission (Commission), requesting issuance of a certificate of convenience and necessity under section 8—406 of the Illinois Public Utilities Act (Act) (220 ILCS 5/8—406 (West 1994)), and orders under sections 8—503 and 8—509 of the Act (220 ILCS 5/8—503, 8—509 (West 1994)) authorizing CIWC to seek to obtain, by eminent domain, temporary easements for test-boring surveys to find groundwater, construct test wells, extract groundwater, and measure the effect of removing groundwater on the water supply in a rural area of Vermilion County, Illinois.

The area involved was outside the area served by CIWC and approximately 15 miles from CIWC's plant in Danville. Persons owning land in the areas upon which entry was sought (landowners) were granted leave to intervene. On June 26, 1996, a divided Commission entered an order allowing the petition and on July 17, 1996, denied landowners' application for rehearing. Acting pursuant to section 10—201(a) of the Act (220 ILCS 5/10—201(a) (West 1994)) and Supreme Court Rule 335 (155 Ill. 2d R. 335), the landowners filed a timely petition for judicial review by this court.

On judicial review, the landowners maintain (1) sections 8—406, 8—503, and 8—509 of the Act do not give the Commission authority to issue the type of order sought here; (2) even if the Act provided for that type of relief, CIWC did not make the required proof; (3) the Commission's order violated the state and federal constitutions; and (4) seismic testing by CIWC in roadways next to landowners' fields precluded CIWC from being entitled to the order on review. The question of whether the Act authorizes CIWC or other similar utility to obtain an easement for testing purposes rather than to obtain a permanent right to drill for and obtain water for use by its customers is a close and complicated question. We conclude the Act does so provide. We find no merit in the landowners' other claims of error. We affirm.

A substantial amount of evidence was presented to the hearing examiner for the Commission. Craig Cummings, executive vice-

president and general manager of CIWC, gave the following explanation of CIWC's request.

CIWC was seeking relief in this proceeding in an effort to resolve a public health concern and assure the continued provision of safe drinking water to the approximately 55,000 residents of the Vermilion County district. The United States Environmental Protection Agency determined that at times the nitrate levels in the water of Lake Vermilion, where the company obtains its water supply, were excessively high. In response to the nitrate problems, the Illinois Environmental Protection Agency (IEPA) required CIWC to execute a letter of commitment in the summer of 1992 that it would bring the nitrate levels in the water it supplies to its customers to the levels that comply with the federal primary drinking water standards by April 1, 1997. Cummings indicated the CIWC was evaluating several options of complying with its letter of commitment with the IEPA.

Cummings further explained that those alternatives included a groundwater blending option, which is the subject matter of the petition here. He stated that information from the well-testing program proposed by CIWC was essential to permit a thorough evaluation of the groundwater option. He stated that CIWC, together with the Illinois State Geological Survey (ISGS) and the Illinois State Water Survey (ISWS), conducted test-boring surveys on the west side of Lake Vermilion. The survey results showed the finger of the aquifer closest to CIWC's system did not offer a reliable long-term source of water. Accordingly, CIWC, in its consultation with ISGS and ISWS, sought an appropriate alternative. CIWC determined that additional tests should be conducted north of the lake and south of the City of Henning to determine (1) whether that aquifer there provided an adequate source of supply, and (2), to minimize costs, how far south production wells could be located.

Cummings further testified that to evaluate the feasibility and cost of the proposed groundwater project, CIWC would be required to enter private property in the agricultural areas which CIWC, in consultation with ISGS and ISWS, had identified as being best for the drilling of test wells and other testing. He stated that the landowners had refused permission for CIWC to enter their land and perform the drilling and testing. He explained that CIWC would construct temporary wells on some properties and two-inch piezometers on other properties, all for the purpose of determining the ground-water supply in the area and the damage, if any, that withdrawal of substantial quantities of the water would have on the supply available for the landowners. Cummings asserted that without this test-

ing, CIWC could not completely determine which method of solving the nitrate problems would be the most cost efficient.

John Jansen, vice-president of a water resource discovery and management company, Ted Zorich and Associates, Inc., testified regarding seismic testing in the area from which he had concluded that test wells should be dropped on the properties subject to this petition. He described the program that would be followed in the event the requested relief is granted, which would likely consist of several controlled pumping tests. He stated that on properties where wells are not dropped, the two-inch piezometers would be installed to record the effect of pumping on the overall water table. Jansen also stated the temporary wells would be pumped at a sufficient rate and duration to determine the safe, continuous yield and boundary condition of the aquifer. He said if the data results were favorable, they would be used to design a well field, project the long-term water levels of the aquifer, and predict the potential effect of the well field on neighboring wells and surface water bodies. Jansen indicated that a capacity of 5 to 7 million gallons per day would be necessary to supplement the water supply from Lake Vermilion, and this would require the eventual installation of approximately five wells with capacities of 1,000 gallons per minute.

Jansen testified that the data from the test wells, when taken in conjunction with regional studies of the ISGS, would eventually allow the company to select well sites in the deepest portion of the Danville bedrock valley, which are likely to have the greatest thickness of Mahomet sand and provide the highest production capacity with the least impact on surrounding wells. He stated that based upon the current knowledge of the aquifer, he did not believe the operation of the test wells would have any significant impact upon existing wells. He also testified that if any adverse effects were detected, the pumping test at the site would be discontinued, and that this was one of the purposes of the proposed test wells.

Roy King, an employee of the Commission as a utility engineer in the water/sewer program, testified that testing was needed and recommended to allow CIWC to reduce the nitrate level in its water supply as mandated by IEPA. It was his understanding that to reduce the nitrate levels in the water supply required either a new source of supply, treatment of the existing source, or some kind of combination, such as an alternative supply, which could be blended with the existing supply. He noted that following the filing of the instant petition, CIWC had entered into a contract with CSX Transportation, Inc. (CSX), to drill five test wells along its railroad right-of-way. He believed the need for the sites requested in the petition remained, de-

spite the CSX sites, because additional observation points were necessary to determine the effect of pumping water from the aquifer and the resulting impact on existing wells. In addition, King questioned the viability of operating permanent wells on CSX's right-of-way.

Harold Perry and Gordon Alexander, both of whom are active in the Vermilion County agricultural community, testified in opposition to the petition. Alexander indicated his belief that water from abandoned strip mine pits located west of Danville and in close proximity to the company's pumping station could be utilized as an additional source of water for Lake Vermilion. Alexander also indicated that other acceptable treatment methods such as ion exchange, reverse osmosis, and charcoal filtration should be considered. Finally, Alexander expressed his belief that a great potential existed for area wells to be adversely affected to the point of going dry or having their output severely curtailed if massive amounts of groundwater were removed from the area. He based this belief upon his understanding that the area upon which the wells are sought to be placed are located upon only a finger of the Mahomet aquifer, making the amount of water available smaller than other areas located over the main channel of the aquifer.

Perry joined in Alexander's concerns that massive amounts of groundwater removal from their private property would cause their wells to dry up or severely curtail their water supply. He testified that the CSX sites were sufficient to allow all the requisite testing without recourse to the landowners' private property. He was unconvinced of the nitrate problems with Lake Vermilion since there had been no nitrate alerts for $3^1/2$ years at that time. He believed the CIWC wanted to expand its water supply at the expense of local residents' wells to allow it to serve additional customers and not to correct nitrate problems with Lake Vermilion.

Brett Carney, an employee of Hanson Engineers, Inc. (Hanson), and a certified professional geologist and hydrogeologist, also testified on behalf of the landowners. He testified that he was unable to determine, from a review of the materials submitted by CIWC in support of the petition, whether testing on the landowners' properties was a "necessity" or whether the CSX sites alone would be sufficient to provide CIWC with adequate information concerning the nature of the aquifer. He indicated the CSX sites were in close proximity to the sites requested in the petition and "could yield valuable information." Carney also indicated the company could place piezometers along county roads to use in conjunction with the CSX sites to determine if the CSX sites alone would provide enough information to map and evaluate the aquifer.

Carney testified since the details of the CIWC investigation were unclear, it was difficult for him to evaluate the feasibility of the project. He concluded that given the lack of specific details for the investigation proposed by CIWC, he saw no reason why its present plan could not be implemented on the existing CSX railroad sites.

Deborah Ramsey, a senior chemical engineer/process engineer for Hanson, testified for the landowners. She said she reviewed a document entitled "February 1989 Update for Proposed Water Treatment Facilities for Inter-State Water Company by Himmel and Oliver." The 1989 report evaluates three water treatment alternatives for nitrate removal: reverse osmosis, ion exchange, and biological treatment. She said the report rejects biological treatment due to start-up time frame problems and finds ion exchange more cost effective than reverse osmosis. The report discusses dilution options, finding the development of a well field more cost effective than the construction of a second reservoir. Following Ramsey's review of the 1989 report and the testimony of Cummings, she concluded that while the company's conclusion may be correct, the information provided is not sufficient for the formation of an opinion as to whether the well-field proposal is the most cost-effective alternative.

Ramsey went on to testify that, in her opinion, some type of watershed management program should be instituted. She said this would entail working with the local agricultural community in the reservoir watershed to try to reduce nitrate runoff into Lake Vermilion. She said the farmers would be encouraged to reduce the amount of fertilizer applied, change the method of application, and create grassed waterways and drainageways to reduce the levels of nitrate and runoff.

Cummings testified in rebuttal, responding to the testimony of the witnesses for the landowners. He stated: (1) although the information from the CSX sites is helpful, it is not enough to make an adequate evaluation of the groundwater resources in the area; (2) one such site was not usable for a well, and none would make good places for permanent wells; (3) abandoned strip mine pits would be inadequate sources of additional water because of uncertain volume and poor quality due to mineral buildup from the mine tailings, as well as possible high nitrate levels from the runoff of nearby farmlands, or even possible septic systems discharging into the open pit; (4) the ion-exchange process had been tested at the Danville plant and problems arose concerning the disposal of the backwash at a reasonable cost as the Danville Sanitary District had refused to accept this substance; and (5) the engineering aspect of incorporating the procedure into the existing system was uncertain.

Cummings noted that CIWC had not yet determined the option it would select to consider the nitrate problem, but the results from the testing, which is subject to this case, would be very helpful in making the decision. Cummings further pointed out that CIWC was in no position to implement a watershed management program to control the nitrate level in Lake Vermilion, as it controlled less than 1% of the watershed and had no governmental power over the watershed, which extends into Indiana. He also noted that the installation of piezometers along county roads could interfere unduly with the normal flow of traffic. He responded to Perry's concern about damage to the local water supply by pointing out that the test wells would not pump out a large quantity of water and that the avoidance of imposing dry wells on the landowners was a primary reason for testing before permanent wells were sunk.

Jansen testified in rebuttal that railroad right-of-ways would be bad places for any kind of wells because of the limited space available and the danger of an entire well field being contaminated by a chemical spill from a railroad car near a well. The rebuttal testimony of King supported that of Cummings and Jansen in regard to the lack of feasibility of using only railroad right-of-ways for test wells.

After the landowners refused CIWC permission to enter their land for the purpose of doing the proposed testing, CIWC filed a petition in the circuit court of Vermilion County seeking an order authorizing entry of the land for test purposes pursuant to section 8—510 of the Act (220 ILCS 5/8—510 (West 1994)), which provides that utilities with a certificate of convenience and necessity may enter the lands of others under certain conditions "[f]or the purpose of making land surveys." The circuit court of Vermilion County denied that request, ruling that the testing procedures requested here go beyond the making of a survey.

■ The instant proceeding has been brought to obtain authority to enter landowners' property for a temporary easement to drill the test wells and perform the testing procedures. CIWC sought the power to condemn under section 8—509 of the Act and a certificate of convenience and necessity to construct the test wells and other fixtures necessary to do the testing procedures, pursuant to section 8—406 of the Act. Section 8—509 of the Act states:

> "When necessary for the construction of any alterations, additions, extensions or improvements ordered or authorized under Section 8—503 or 12—218 of this Act, any public utility may enter upon, take or damage private property in the manner provided for by the law of eminent domain." 220 ILCS 5/8—509 (West 1994).

Accordingly, CIWC sought authority under section 8—503 of the

Act to construct the temporary test wells and other facilities necessary for the testing. Section 8—503 of the Act provides:

> "Whenever the Commission, after a hearing, shall find that additions, extensions, repairs or improvements to, or changes in, the existing plant, equipment, apparatus, facilities or other physical property of any public utility or of any two or more public utilities are necessary and ought reasonably to be made or that a new structure or structures is or are necessary and should be erected, to promote the security or convenience of its employees or the public, or in any other way to secure adequate service or facilities, the Commission shall make and serve an order authorizing or directing that such additions, extensions, repairs, improvements or changes be made, or such structure or structures be erected at the location, in the manner and within the time specified in said order." 220 ILCS 5/8—503 (West 1994).

■ Section 8—406 of the Act, which provides for a certificate of convenience and necessity, states, in part, that the Commission may issue a certificate to a public utility to begin the construction of any new plant, equipment, property or facility upon a showing by the utility of the following relevant factors: (1) the proposed construction is necessary to provide adequate, reliable and efficient service to its customers and is the least-cost means of satisfying the service needs of its customers; (2) the utility is capable of efficiently managing and supervising the construction process and has taken sufficient action to ensure adequate and efficient construction and supervision thereof; and (3) the utility is capable of financing the proposed construction without significant adverse financial consequences for the utility or its customers.

■ The landowners' theory that the Commission had no authority under sections 8—509, 8—503, and 8—406 of the Act to grant the relief requested begins with the contention that no statutory authority for a utility to drill for water was cited before the Commission. The short answer to that assertion comes from sections 11—138—1 and 11—138—2 of the Illinois Municipal Code (Code) (65 ILCS 5/11—138—1, 11—138—2 (West 1994)). Section 11—138—1 of the Code permits a water company such as CIWC to "locate its source of supply at, or change its source of supply to, a point not more than 20 miles beyond the corporate limits of the municipality" served and "take and damage private property" to do so. 65 ILCS 5/11—138—1 (West 1994).

Section 11—138—2 of the Code authorizes proceeding in eminent domain to do so. The landowners assert that we should not consider these statutory provisions because they were not presented to the

Commission. However, we conclude that the rule that permits this court to search the record to affirm, regardless of whether it was relied upon by the trial court and regardless of whether the reason given was correct (*Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 387, 457 N.E.2d 9, 12 (1983)), is applicable to this administrative review.

More importantly, the landowners contend that sections 8—406, 8—503, and 8—509 of the Act seem to refer only to takings of property for *permanent* facilities and not for temporary easements for testing purposes as sought here. They call attention to the reference to "alterations, additions, extensions or improvements" described in section 8—509 of the Act and the "extensions, repairs or improvements to, or changes in, the existing plant, equipment, apparatus, facilities or other physical property" referred to in section 8—503 of the Act. The landowners also point to somewhat similar language in section 8—406 of the Act.

The landowners note a rule that any statutory authority that purports to permit agents of utilities to enter private land is in derogation of the landowners' common law rights and should be strictly construed. *Diamond v. General Telephone Co.*, 211 Ill. App. 3d 37, 49, 569 N.E.2d 1263, 1270 (1991). The landowners conclude that even a moderately strict construction of sections 8—406, 8—503, and 8—509 of the Act negates any statutory authority for the ruling provided by CIWC. They maintain the Commission should have dismissed CIWC's petition for lack of authority to proceed.

We recognize the lack of any clear express authority under the Act for the Commission to give a utility authority to condemn for temporary easements to make tests to determine whether permanent interests in property should later be condemned. However, in interpreting the somewhat uncertain legislation, we give some deference to the Commission, which is the agency charged with its administration. See *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152, 447 N.E.2d 295, 300 (1983); *Adams v. Jewel Cos.*, 63 Ill. 2d 336, 344-45, 348 N.E.2d 161, 165 (1976). The Commission had no difficulty in holding that it had statutory authority to issue a certificate of convenience and necessity for authorizing condemnation for the proposed temporary testing project.

We also note that in *Wilcox v. Illinois Commerce Comm'n*, 23 Ill. 2d 432, 439-40, 178 N.E.2d 873, 877 (1961), the Supreme Court of Illinois upheld a Commission's order issued under "An Act concerning the use of eminent domain ***" (Gas Act) (Ill. Rev. Stat. 1959, ch.

104, par. 104 *et seq.*) permitting condemnation for underground gas storage even though the project was on an "experimental basis." Nothing in that legislation specifically authorized condemnation for temporary purposes. Most condemnations authorized under the Act are undoubtedly for easements for electric power lines or gas and water mains. The need to condemn to run test wells in regard to underground sources of water would not arise as often and may well explain the lack of precedent here. The testing in regard to the gas storage dome in *Wilcox* is similar to the testing proposed here.

■ Considering the deference we give to the Commission, the construction the supreme court gave to the Gas Act and the common sense of permitting condemnation to test the quality of a water source before making permanent facilities, we hold that the temporary testing wells and the installation of the piezometers and other testing devices testified about are proposed "additions" within the meaning of sections 8—503 and 8—509 of the Act, which could be found to be "necessary" for CIWC to "secure adequate service" to its customers by enabling CIWC to determine the best method to reduce the nitrate content of its water. In much the same manner, these wells and other testing devices could be found to be facilities necessary for efficient low-cost service, which CIWC was capable of constructing and which was economically feasible, all within the meaning of section 8—406 of the Act. The Commission properly denied landowners' motion to dismiss CIWC's petition for failure to set forth grounds for relief.

We can properly overturn the Commission's decision for lack of proof only if that decision is not supported by substantial evidence. See *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 204, 555 N.E.2d 693, 698 (1989); *People ex rel. Hartigan v. Illinois Commerce Comm'n*, 117 Ill. 2d 120, 142, 510 N.E.2d 865, 874 (1987). CIWC's proof here clearly meets that standard of substance. The Commission could find from the testing that CIWC was not likely to be able to put into operation a scheme whereby the runoff into Lake Vermilion would have a reduced content of nitrates and that the use of water in abandoned open mine pits would not be favorable. The Commission could also properly find that the use of chemicals to remove nitrates in the water supply lacked feasibility.

From time to time, both before the Commission and here, the landowners' argument has confused the question of whether test wells should be denied to determine the feasibility of removing water from the vicinity of their land with the question of whether the permanent wells should ultimately be drilled. The evidence permitted

the Commission to conclude that no great damage was likely to result to the landowners from the drilling of the temporary wells and that these wells would enhance the ability to make a subsequent decision as to whether permanent wells should be placed there. We can understand the concern of the landowners as to preserving their water supply, but if a subsequent condemnation suit is brought to condemn for permanent wells, they will have more information as to the danger involved than is now available.

In regard to both the right to condemn and the issuance of the certificate of convenience and necessity, the necessity for the testing is a significant issue. In that regard, the "necessity" does not require that element in issue be "indispensably requisite" but only needful and useful to the public. *Eagle Bus Lines, Inc. v. Illinois Commerce Comm'n*, 3 Ill. 2d 66, 78, 119 N.E.2d 915, 922 (1954). The information presented as to the feasibility of effectively obtaining water to dilute the nitrates in the utility's major source of supply meets that requirement.

More specifically, section 8—406 of the Act requires that for issuance of a certificate of convenience and necessity, the Commission must not only find the necessity for the construction, but also that it is the "least-cost means of satisfying the service needs of its customers," and that the utility is capable of managing the construction and financially able to do so. 220 ILCS 5/8—406(b) (West 1994). The landowners contend that proof of the "least-cost means" was not made here. No evidence was presented as to the cost of the temporary wells or the other testing devices. However, the Commission could conclude from the evidence that the proposed method of adding well water to the main source of supply appeared to be the only feasible method of proceeding and was, thus, the "least-cost means."

The landowners argue that the Commission's order violates the state and federal constitutional provisions against the public taking of private property. U.S. Const., amend. V; Ill. Const. 1970, art. I, § 15. Their position is apparently based upon a theory that the order entitling CIWC to seek easements was, in fact, an order permitting seeking of a permanent taking of the land on which the wells were located, along with a permanent easement of access to the wells for piping therefrom. Such is simply not so. Further proceedings before the Commission would be required before proceedings under eminent domain could be started for the purpose of obtaining permanent rights. The information sought to be gained by the granting of a temporary easement may be such as to be protection to the landowners. The case of *Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991), relied upon by the landowners in contending the Commission's

order is in violation of their constitutional rights, is authority for the legal theory that the temporary easements sought here are a taking requiring just compensation to the landowners. That just compensation would be granted to the landowners in the subsequent eminent domain proceeding ordered by the Commission.

Evidence presented at the hearing before the Commission indicated that agents of CIWC had conducted some seismic testing on the edge of roads by property of the landowners in order to obtain data relevant to the availability of underground water in those spots. We are aware of the interest of landowners in one-half of the road adjacent to their land. See *Thompson v. Maloney*, 199 Ill. 276, 285-90, 65 N.E. 236, 238-40 (1902). Landowners do not present a clear argument as to whatever relief they may be entitled for whatever trespassing might have resulted. We know of no rule that would require suppression of any information obtained thereby, and the instant proceeding is not one in which any compensation could be awarded for any tort that might have been committed.

Accordingly, we affirm the Commission's order on review.

Affirmed.

STEIGMANN, P.J., and KNECHT, J., concur.