EDWIN CLAIRE DIAMOND *et al.*, Plaintiffs-Appellants, v. GENERAL TELEPHONE COMPANY OF ILLINOIS, Defendant-Appellee.

Second District   No. 2—90—0624

Opinion filed April 3, 1991.

38

Gallagher & Joslyn, of Oakbrook Terrace (Mark C. Amador, of counsel), for appellants.

D. Kendall Griffith and Bruce L. Carmen, both of Hinshaw & Culbertson, of Chicago (David H. Levitt, of counsel), for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

Plaintiffs, Edwin Claire Diamond, Leona Diamond and their insurer, Rockford Mutual Insurance Company (hereinafter collectively referred to as the Diamonds), appeal the dismissal with prejudice of their eight-count complaint against the defendant, General Telephone Company of Illinois, presently known as GTE North, Inc., and hereafter referred to as GTE. (Ill. Rev. Stat. 1989, ch. 110, par. 2—615.) The Diamonds contend the court erred in dismissing their complaint in that it stated valid causes of action for implied indemnity, violation of the Illinois Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 1—101 *et seq.*) and tortious conduct creating exposure to litigation. They further contend the court erred in dismissing all counts with prejudice without hearing any evidence. We affirm.

Edwin and Leona Diamond owned and farmed a parcel of land in Spring Township of Boone County immediately adjacent to the intersection of Illinois highway I-90 and Garden Prairie Road. GTE sought

an easement on this parcel from the Diamonds. Accordingly, a right-of-way permit given in consideration of $1 and signed by the Diamonds on March 22, 1961, gave GTE "the right, privilege, easement and authority to construct, operate, patrol and maintain its communication lines including the necessary underground cables, wires, conduits, splicing boxes, surface terminals, markers and appurtenances upon, over and across the land." Pursuant thereto, GTE placed a telephone pole, supported by a single down guy wire, and other associated telephone equipment on the Diamonds' property.

On the morning of October 11, 1980, Kenneth and Lorelie Smith and two of their children, Karen and Christine, were traveling in their van in a northwesterly direction on I-90 near the intersection of Garden Prairie Road. At the same time, Randy Hatcher, an employee of Signal Delivery Service, Inc., was driving a tractor trailer rig southeasterly on I-90. As the Signal Delivery truck and the Smith van approached each other going in opposite directions, the GTE telephone pole placed on the Diamond property leaned over, presumably as the result of its guy wire failure, and the cable attached thereto which stretched across I-90 to another GTE pole sagged to a height of approximately six to seven feet above the highway. The Signal Delivery truck struck the sagging cable and, after it was pulled taut, the pole placed on the Diamond property broke and was slung across the highway at a high rate of speed. The pole struck the Smith van, killing Kenneth and Lorelie Smith, in the presence and view of their children.

As a result of the October 11 accident, a multicount complaint was filed in the circuit court of Cook County, Illinois, captioned Morton et al. v. GTE et al., case No. 81—L—2162 (referred to hereafter as Morton v. GTE or the underlying cause). The complaint alleged specific acts of negligence as to GTE, the Diamonds, and Signal Delivery Service. Pertinent here, it was alleged as to the Diamonds that they carelessly and negligently plowed their land adjacent to the telephone pole and supporting guy wire, that they permitted the plow blade to come in contact with the guy wire and that they severed the guy wire connecting the utility pole to the ground. As to GTE, it was alleged that it carelessly and negligently maintained and controlled the pole, failed to provide guy wires of sufficient number and strength to secure the pole, failed to provide reasonable and adequate warnings of the location of the guy wire to persons likely to be plowing the land in proximity to the guy wire, failed to provide a reasonable or adequate guard or protective device for the guy wire to protect it from being severed or damaged, failed to place its equipment under-

ground, allowed the pole to remain at the location in a rotted condition, failed to conduct reasonable inspections of the pole and associated equipment, and failed to use a pole of sufficient size and strength to withstand the eventuality of its guy wire being severed. It was also alleged that the said pole was situated on the property of the defendants, Edwin C. Diamond and Leona Diamond.

In October 1985 an additional two-count complaint for damages caused to Signal Delivery Service's truck was filed against GTE and the Diamonds by Signal Delivery Service and an affiliate corporation under the caption Leaseway Transport Corp. *et al.* v. GTE *et al.*, No. 85–LM–3665 in Du Page County.

The Diamonds were informed by their liability insurance carrier, Rockford Mutual Insurance Company, that it would not be liable for any damages in excess of the $300,000 policy limit. In view of their potential exposure to liability far in excess of the policy limit, the Diamonds retained their own personal counsel.

Early in 1984, Rockford Mutual began a concerted effort to reduce or eliminate the exposure of its insureds. In response to these overtures, the plaintiffs' attorney in Morton v. GTE offered to provide a complete release to GTE and the Diamonds in return for a payment from GTE of $1 million and a payment on behalf of the Diamonds of $250,000. Although the Diamonds and Rockford Mutual accepted this offer, GTE refused it. After further negotiations, the plaintiffs' attorney in Morton v. GTE agreed to a conditional covenant not to execute judgment in consideration of receipt of the Diamond's $300,000 policy limit. The effect of this agreement was that the Diamonds would remain parties to the litigation, but they would be liable for a judgment therein only if they were the sole parties found guilty at trial. The agreement included a "non-admission of liability" clause. The Diamonds subsequently settled the Signal Delivery Service Du Page County litigation for $500. They paid this amount personally inasmuch as their liability insurance policy limit had been exhausted.

On September 9, 1987, the Morton v. GTE case was resolved in the circuit court of Cook County. The jury returned verdicts in favor of Edwin Claire Diamond, Leona Diamond and Signal Delivery Service. It found against GTE, assessing actual damages of $16 million and punitive damages of $20 million.

Thereafter, on March 14, 1989, the Diamonds filed the instant complaint in the circuit court of Kane County. In addition to recounting the facts of the underlying cause as noted in the preceding paragraphs, it was alleged that by virtue of the execution of the 1961 right-of-way permit a pretort relationship existed between the Dia-

monds and GTE. The complaint also asserted that, in comparison with the Diamonds, GTE had the greater or primary duty to maintain the subject property, to inspect and test its poles, wires and associated equipment, and to maintain and protect the down guy wire which helped support the pole placed on the Diamond property. The complaint also asserted that by virtue of the doctrines of *res judicata* and collateral estoppel, the major, active and primary fault of GTE and the lack of fault of the Diamonds had been conclusively established by the Cook County verdicts.

Counts I and II of the complaint sought implied indemnity for the Diamonds from GTE for its negligent repair and maintenance of the easement property and for its wilful and wanton failure to maintain the easement property. Count III sought recovery under section 5–201 of the Illinois Public Utilities Act for GTE's violation of Illinois Commerce Commission General Order 160, and count IV sought recovery for GTE's tortious conduct which exposed them to litigation. The Diamonds sought indemnity for their $500 settlement with Signal Delivery and for the $1,400 which they paid as legal fees in Morton v. GTE. They also sought an award for the embarrassment, mental anguish, humiliation and apprehension they suffered due to their exposure to litigation caused by GTE's tortious conduct. Counts V, VI, VII and VIII alleged the same causes of action against GTE by Rockford Mutual on its own behalf and as subrogee of Edwin and Leona Diamond. Rockford Mutual sought indemnity in the amount of $390,250.70 for its policy limit payment and legal fees in Morton v. GTE. It also sought an award for its exposure to litigation caused by GTE's tortious conduct.

■ We consider first whether the court's dismissal of the implied indemnity counts (counts I, II, V and VI) was proper. We are mindful that all well-pleaded facts contained in the complaint must be taken as true, and we must draw all reasonable inferences in the Diamonds' favor. (*AMF, Inc. v. Victor J. Andrew High School* (1988), 172 Ill. App. 3d 337, 339.) We are mindful also that, in the absence of an indication of the basis for the court's decision, we may affirm the court's dismissal upon any of the issues raised in GTE's motion to dismiss. *Martin-Trigona v. Bloomington Federal Savings & Loan Association* (1981), 101 Ill. App. 3d 943.

In its motion to dismiss the complaint and its memorandum in support thereof, GTE asserted that all counts of the complaint were premised on the theory of active-passive implied indemnity, which was abolished by the Illinois Supreme Court in *Allison v. Shell Oil Co.* (1986), 113 Ill. 2d 26. GTE further asserted that, having settled with

the plaintiffs in Morton v. GTE, the Diamonds were barred from seeking indemnity by the supreme court's decision in *Thatcher v. Commonwealth Edison Co.* (1988), 123 Ill. 2d 275, and *Van Berkum v. Christian* (1988), 175 Ill. App. 3d 62, which relied on *Thatcher*. GTE additionally argued the Diamonds' complaint shows they do not fall within the class of persons intended to be protected by the Illinois Public Utilities Act, and no court has recognized a cause of action which allowed recovery for tortious conduct creating exposure to litigation.

The Diamonds contend GTE's arguments were erroneous and should not have been accepted by the trial court. They contend *Allison* did not abolish all forms of implied indemnity; that the pretrial settlement in *Thatcher* is distinguishable from the instant covenant not to execute judgment; that public policy favors the continued use of implied indemnity; that the Public Utilities Act provides a remedy for any person or corporation "affected" by the violation of the Act; and Illinois courts should recognize a cause of action for tortious conduct creating exposure to litigation.

In *Allison v. Shell Oil Co.* (1986), 113 Ill. 2d 26, an owner and a subcontractor (the third-party plaintiffs) were sued under the Structural Work Act (Ill. Rev. Stat. 1985, ch. 48, par. 60 *et seq.*). They in turn alleged that the general contractor (the third-party defendant) on the project was liable to indemnify them as the result of their qualitative difference in liability to plaintiff. The general contractor responded that the passage of the Contribution Act in 1978 abolished all forms of implied indemnity.

With certain exceptions discussed below, the supreme court determined that with the abolition of contributory negligence, the adoption of comparative negligence in *Alvis v. Ribar* (1981), 85 Ill. 2d 1, and the enactment of "An Act in relation to contribution among joint tort-feasors" (the Contribution Act) (Ill. Rev. Stat. 1989, ch. 70, par. 301 *et seq.*), the doctrine of active-passive implied indemnity no longer was a viable doctrine for shifting the entire cost of tortious conduct from one tort-feasor to another.

Largely in response to the harsh rule which prohibited contribution among jointly negligent tort-feasors, the concept of active-passive implied indemnity evolved as an extension of the doctrine which implied a contractual right of indemnity in favor of a party liable in law (such as an employer or an owner) who had not contributed to a party's injury. (See *Allison*, 113 Ill. 2d at 28-30.) This right of equitable implied indemnity based upon the active-passive fault of the parties ultimately evolved to the extent that indemnity was allowed even in

the absence of vicarious liability or any pretort relationship which implied a promise to indemnify simply on the basis that " 'degrees of fault must be recognized which will permit indemnification from tortfeasors substantially at fault to those less blameworthy.' " *Allison*, 113 Ill. 2d at 30, quoting *Sargent v. Interstate Bakeries, Inc.* (1967), 86 Ill. App. 2d 187, 198.

The overgrowth of equitable implied indemnity based on the relative fault of the parties was halted with the adoption of the Contribution Act in 1978 and pure comparative negligence in *Alvis*. The Contribution Act established a statutory scheme whereby joint tort-feasors could obtain contribution amongst themselves, and, after *Alvis*, it was clear that the governing principle of comparative negligence—that the costs of accidental injury should be *apportioned* according to the relative fault of all concerned in the action—was not in harmony with active-passive indemnity which shifts *all* costs of liability to only one of two or more parties actually at fault.

Rejecting the third-party plaintiffs' contention in *Allison* that active-passive indemnity nonetheless was a viable alternative to contribution where there exists a pretort relationship and a qualitative difference between the fault of the tort-feasors, the court noted that suits for active-passive indemnity are, in fact, merely actions for ordinary negligence to recover damages from the indemnitor by an indemnitee whose conduct was "passive," *i.e.*, not contributorily negligent, or where the indemnitor "squandered the last clear chance." *Allison*, 113 Ill. 2d at 33.

> "Having adopted comparative negligence and the principles of apportioning rather than affixing liability, not only in *Alvis*, but also in *Skinner* [(*Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1)] and by the Contribution Act, the need for implied indemnity based upon an active-passive distinction has also evaporated." *Allison*, 113 Ill. 2d at 34.

■ We agree with the Diamonds that *Allison* did not abolish *all* forms of implied indemnity. We disagree, however, that their complaint has stated a cause of action for any still-viable form of implied indemnity.

Prefacing its decision that actions premised on active-passive implied indemnity were no longer viable in Illinois, the supreme court stated:

> "We note at the outset *** that the claims for indemnification in this case are not premised upon an underlying action regarding *a defective product* or the would-be indemnitees' *vicarious liability* for the conduct of their indemnitor [citation], and we

express no opinion on the continued vitality of implied indemnity in those cases. Neither does our opinion in this case affect the validity of *explicit undertakings* among two or more parties to shift from one party to another the ultimate cost of liability which may arise in favor of a third party." (Emphasis added.) *Allison*, 113 Ill. 2d at 27.

Thus, it is clear that *Allison* did not extinguish all forms of implied indemnity. (Accord *Frazer v. A.F. Munsterman, Inc.* (1988), 123 Ill. 2d 245, 253-56 (for questions not finally determined); *Thatcher v. Commonwealth Edison Co.* (1988), 123 Ill. 2d 275, 279.) Claims for implied indemnification premised on underlying actions regarding defective products, vicarious liability and express contractual obligations were excepted from *Allison*'s abolition of active-passive indemnity as a viable doctrine for shifting the entire cost of tortious conduct from one tort-feasor to another.

The continued vitality of upstream indemnity based on strict product liability was subsequently restricted in *Frazer*, however (owner of truck and trailer hitch which came loose from truck who was found liable to injured plaintiff for negligently failing to discover the defect in the hitch may not recover indemnity from the manufacturer based on strict liability because it would be unfair for the negligent owner to shift the entire burden of liability to the manufacturer via indemnity) (123 Ill. 2d 245), and that restriction was further extended in *Thatcher* (Commonwealth Edison's settlement with injured plaintiff in underlying suit charging Commonwealth Edison with fault-based theories of negligence and violations of the Structural Work Act barred it under *Frazer* from seeking indemnity from the manufacturer of the high-pressure hose which caused plaintiff's injury since the settlement was made to avoid trial and a potential holding of liability) (123 Ill. 2d 245).

■ Although *Allison* has not been construed as eliminating the viability of implied nontort indemnification (see *People ex rel. Hartigan v. Community Hospital* (1989), 189 Ill. App. 3d 206, 216, and cases cited therein), the instant cause cannot succeed as such a claim.

" 'Implied indemnity' is based on principles of restitution: 'a contract implied in law arising from the legal obligation of an indemnitee to satisfy liability caused by the actions of the indemnitor.' [Citations.] *The fundamental premise for the cause of action is that the indemnitee, although without fault in fact, has been subjected to liability solely because of the legal relationship with the plaintiff or a nondelegable duty arising out*

*of common or statutory law.* [Citation.]" (Emphasis added.) *Frazer,* 123 Ill. 2d at 255.

See also *Allison,* 113 Ill. 2d at 29.

Assuming, *arguendo,* the Diamonds fell within either of the classic pretort relationships of owner-lessee or lessor-lessee which have given rise to a duty to indemnify (see *Van Slambrouck v. Economy Baler Co.* (1985), 105 Ill. 2d 462, 469-70 (noting also the relationships of employer-employee and master-servant)), it is indisputable from an examination of the underlying complaint that the potential liability of the Diamonds in the underlying cause was not based solely on their pretort relationship with GTE or on any express contractual basis, but, rather, it was based on their alleged acts of negligence in plowing too closely to the guy wire and severing it.

The Diamonds argue their complaint seeks the relief recognized in sections 95 and 97 of the Restatement of the Law of Restitution:

"§95. PERSON RESPONSIBLE FOR A DANGEROUS CONDITION.

Where a person *has become liable with another for harm caused to a third person* because of his negligent failure to make safe a dangerous condition of land or chattels, which was created by the misconduct of the other or which, as between the two, it was the other's duty to make safe, he is entitled to restitution from the other for expenditures properly made in the discharge of such liability, unless after discovery of the danger, he acquiesced in the continuance of the condition.

\* \* \*

§97. NEGLIGENCE FOLLOWED BY ANOTHER'S INTENTIONAL OR RECKLESS MISCONDUCT.

A person whose negligent conduct combined with the reckless or intentionally wrongful conduct of another has resulted in injury *for which both have become liable in tort to a third person* is entitled to indemnity from the other for expenditures properly made in the discharge of such liability, if the other knew of the peril and could have averted the harm at a time when the negligent tortfeasor could not have done so." (Emphasis added.) Restatement of the Law of Restitution §§95, 97 (1937).

■ These sections are inapplicable to the Diamonds. First, the jury determined the Diamonds were *not* liable to the plaintiffs in the underlying cause; only GTE was found liable. Second, these sections embody the concepts of passive (noncontributory) negligence and last clear chance which the *Allison* court found merely perpetuated the

theory of fault repudiated in *Alvis v. Ribar,* that is, that one party was ultimately responsible for any injury. *Allison,* 113 Ill. 2d at 33-34.

The Diamonds contend, nonetheless, that the mere fact they were exposed to liability for their own actions, independent of GTE's actions, should not deprive them of their right to seek indemnity. They point to *Jardine v. Rubloff* (1977), 51 Ill. App. 3d 492, *Trzos v. Berman Leasing Co.* (1967), 86 Ill. App. 2d 176, *Blaszak v. Union Tank Car Co.* (1962), 37 Ill. App. 2d 12, and *Folkers v. Drott Manufacturing Co.* (1987), 152 Ill. App. 3d 58, as examples of cases "where numerous defendants and third party defendants, who were 'charged with their own wrong doing [*sic*]' were allowed to seek indemnity." These cases do not support the Diamonds' right to seek indemnity. The first three of these active-passive negligence cases were decided prior to *Allison,* and *Folkers* did not acknowledge the *Allison* decision.

The Diamonds' further argument that the complaint in the underlying cause of action could have been amended to allege that they were merely technically liable to the plaintiffs as owners or occupiers of the land on which the pole was placed is speculative and unsupported by the record. The only liability asserted against the Diamonds in the underlying cause was that based on their own acts of negligence, and the jury found they were not liable to the plaintiffs in the underlying action on this basis. Although their potential liability to the plaintiffs on a premises liability theory would be meaningful in the context of the Diamonds maintaining an action against GTE under the Contribution Act (*Joe & Dan International Corp. v. United States Fidelity & Guaranty Co.* (1988), 178 Ill. App. 3d 741, 750), it has no saving power in the instant implied indemnity action because the Diamonds have already been found not liable in the underlying cause which was based on negligence, not premises liability. Where the plaintiffs in that underlying cause were not able to recover against the Diamonds, there is no need for the Diamonds to seek indemnity from GTE. See generally *Blaszak v. Union Tank Car Co.* (1962), 37 Ill. App. 2d 12, 18.

Finally, we reject outright the Diamonds' argument that public policy favors the continued use of active-passive implied indemnity. By its decision in *Allison,* the supreme court has found the public policy of this State does not favor such continuation, and this court has no desire or authority to rule otherwise.

We conclude the court did not err in dismissing counts I and V of the Diamonds' complaint. Inasmuch as the allegations of wilful and wanton misconduct in counts II and VI of the complaint are

treated no differently than allegations of ordinary negligence for purposes of apportionment of fault (*Yates v. Brock* (1989), 191 Ill. App. 3d 358, 361; *State Farm Mutual Automobile Insurance Co. v. Mendenhall* (1987), 164 Ill. App. 3d 58), we find *Allison* applies equally to those counts, and they were properly dismissed. In light of this conclusion, we do not consider GTE's alternate argument that *Thatcher* also supports dismissal of these counts of the Diamonds' complaint. *Thatcher v. Commonwealth Edison Co.* (1988), 123 Ill. 2d 275 (under the Contribution Act, a defendant who settled a personal injury suit which had alleged theories of fault could not recover by implied indemnity from the nonsettling manufacturer of a pressure hose involved in the accident where the settlement was made to avoid trial and a potential holding of liability).

We consider next the Diamonds' argument that counts III and VII stated a cause of action under section 5—201 of the Public Utilities Act for GTE's violation of Illinois Commerce Commission General Order 160, which relates to telephone pole safety. (Ill. Rev. Stat. 1989, ch. 111⅔, par. 5—201.) In pertinent part, that section provides:

"In case any public utility shall do, cause to be done or permit to be done any act, matter or thing prohibited, forbidden or declared to be unlawful, or shall omit to do any act, matter or thing required to be done either by any provisions of this Act or any rule, regulation, order or decision of the Commission, issued under authority of this Act, the public utility shall be liable to the persons or corporations affected thereby for all loss, damages or injury caused thereby or resulting therefrom, and if the court shall find that the act or omission was wilful, the court may in addition to the actual damages, award damages for the sake of example and by the way of punishment. An action to recover for such loss, damage or injury may be brought in the circuit court by any person or corporation." Ill. Rev. Stat. 1989, ch. 111⅔, par. 5—201.

Count IV of the complaint against GTE in Morton v. GTE was premised on section 73 of the Public Utilities Act (Ill. Rev. Stat. 1979, ch. 111⅔, par. 77), the predecessor of presently codified section 5—201. By their counts III and VII in the instant cause, the Diamonds alleged GTE is also liable to them under section 5—201. They argue the language of the Act "gives the broadest possible remedies to all potential parties seeking recovery," and that the public utility is subject to liability to any person or corporation "affected" by the violation of the Act.

■ At the outset, we note that the Public Utilities Act has been held to be in derogation of the common law (*Consumers Sanitary Coffee & Butter Stores v. Commerce Comm'n ex rel. Commonwealth Edison Co.* (1932), 348 Ill. 615, 618), and, as such, it is to be construed strictly in favor of the persons sought to be subjected to its provisions (*Barthel v. Illinois Central Gulf R.R. Co.* (1978), 74 Ill. 2d 213, 220). We further note that the supreme court has stated that "[g]enerally, a person 'affected' by a wrongful act is one who shows a direct personal interest in the matter as opposed to one whose interest is merely in common with that of the general public. The issue may be expressed as one of standing." *Churchill v. Norfolk & Western Ry. Co.* (1978), 73 Ill. 2d 127, 139.

■ The Diamonds rely on *Churchill* in support of their argument that they had standing under section 5—201. We find their reliance misplaced. In *Churchill*, the supreme court held that a spouse may recover under the Act those compensatory damages for which she becomes liable as a proximate result of the defendant's wrongful act. There, the widow of a train crash victim sought to recover on her own behalf under former section 73 for hospital, medical and funeral expenses and for punitive damages for the railway's wilful violation of the Act and Rule 205 of the Illinois Commerce Commission. The railway contended no cause of action existed when such violations result in death.

In rejecting that contention, the supreme court noted it had decided in *Saunders v. Schultz* (1960), 20 Ill. 2d 301, that actions independent of the Wrongful Death Act may be brought against a defendant whose wrongful act resulted in another's death. The court saw no indication in the Public Utilities Act that persons "affected" by the wrongful act were limited to only those who are physically injured as the proximate result of the wrongful act. Inasmuch as the widow was personally liable under the family expense act (Ill. Rev. Stat. 1955, ch. 68, par. 15) for the medical and funeral expenses of her deceased husband, the court found she had standing under the Public Utilities Act to recover the compensatory damages for which she had become liable as a proximate result of the railway's wrongful act, and she was entitled to recover punitive damages as well. *Churchill*, 73 Ill. 2d at 138-41.

Assuming, *arguendo*, GTE's liability to the plaintiffs in the underlying cause establishes a violation of Illinois Commerce Commission General Order 160 and, thus, establishes its negligence as a matter of law rather than merely *prima facie* evidence of negligence (*Barthel v. Illinois Central Gulf R.R. Co.* (1978), 74 Ill. 2d 213, 220), the Dia-

monds must nevertheless show (1) that the violation proximately caused their injury and (2) that the statute was intended to protect a class to which they belong from the kind of injury suffered. *Barthel*, 74 Ill. 2d at 219-20; *Renken v. Northern Illinois Water Co.* (1989), 191 Ill. App. 3d 744, 747-48.

The Diamonds' complaint shows neither of these requirements has been met. Rather, it shows that the injury suffered by the Diamonds— the $1,400 in legal fees and the $500 settlement with Signal Delivery—was proximately caused by the fact that they were charged by the plaintiffs in Morton v. GTE with their *own independent* acts of negligence in two lawsuits. Clearly, then, the proximate cause was not GTE's wrongful act. Moreover, as GTE argues, nothing in the statute or the general order suggests that a telecommunications company must keep its poles in a safe condition in order to prevent exposing an independent actor to liability in a subsequent lawsuit arising out of that party's acts or omissions.

We conclude the court did not err in dismissing counts III and VII.

The Diamonds next contend Illinois courts should recognize a cause of action for tortious conduct creating exposure to litigation. They assert counts IV and VIII of their complaint were designed to allow them to recover for their mental anguish and humiliation resulting from their joinder as defendants in Morton v. GTE. They argue that because it was GTE's wrongful conduct in the first place which exposed them to litigation which pended for seven years, threatened their financial ruin and the loss of their way of life and, further, because GTE refused to agree to terms which would have settled the cause, it should now be held accountable for all damages flowing from its wrongdoing. They cite *Ritter v. Ritter* (1943), 381 Ill. 549, and *Harvey v. Carponelli* (1983), 117 Ill. App. 3d 448, as cases which establish the general principle that damages should be allowed where the natural and proximate consequences of the wrongful act involve a party in litigation with others.

Although we understand the unease which must have been generated in the Diamonds' lives because of this litigation, we find the trial court correctly dismissed these counts, which purported to state a nonexistent cause of action.

It was the plaintiffs in the underlying cause, not GTE, who drew the Diamonds into the litigation, alleging acts of negligence against them independent of any relationship they had with GTE. The jury found the plaintiffs did not prove the Diamonds' negligence, but did prove GTE's. We cannot agree that GTE should now be held responsi-

ble for the Diamonds' travail in defending themselves against allegations that they were negligent.

In *Ritter*, the court considered whether the plaintiffs, who were successful in their prior suit against the defendant, could then recover damages from him for their time expended, attorney fees and costs. They argued that, because it was the defendant's wrongful conduct which caused them to engage in litigation with him to secure the return of title to their property, they were entitled to recover the expenses they incurred in enforcing their rights. The court disagreed, noting:

"If the wrongful conduct of a defendant causing the plaintiff to sue him would give rise to an independent tort and a separate cause of action, there would be no end to the litigation, for immediately upon the entry of judgment the plaintiff would start another action against the defendant for his attorney fees and expenses incurred in obtaining the preceding judgment." *Ritter v. Ritter* (1943), 381 Ill. 549, 555.

In *Harvey*, the plaintiff sued the defendants, who were her former attorney and his law firm, for professional negligence in the probate proceedings and settlement of her father's estate. Plaintiff appeared *pro se* in the professional negligence suit. By reason of her improper and contumacious conduct during the course of those proceedings, the trial court granted the defendants' third motion for a mistrial and awarded them $2,108.50 in attorney fees and costs.

Plaintiff challenged this award on appeal, but it was upheld. The defendants argued there that the award was proper because the expenses were incurred as a result of the plaintiff's wrongful conduct as *pro se* counsel not as a party plaintiff. Defendants asserted that, as *pro se* counsel, plaintiff's "improper and impertinent behavior magnified the costs of the defendants' defense." (*Harvey v. Carponelli* (1983), 117 Ill. App. 3d 448, 454.) The court agreed, noting the general rule in Illinois that one who commits an illegal or wrongful act is liable for all of the ordinary and natural consequences of his act. (*Harvey*, 117 Ill. App. 3d at 454.) Logically, such "consequences" would include the attorney fees and costs incident to a lawsuit against the wrongdoer.

An exception to the general rule, however, is the "American rule" which states that attorney fees are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor. The reason behind the rule is "that since litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit, and that the poor might be unjustly discouraged from insti-

tuting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel." *Fleischmann Distilling Corp. v. Maier Brewing Co.* (1967), 386 U.S. 714, 718, 18 L. Ed. 2d 475, 478, 87 S. Ct. 1404, 1407.

Although the American rule obviously is not intended to preclude a party from recovering losses directly caused by another party's wrongful conduct simply because those losses take the form of litigation expenses (*Harvey*, 117 Ill. App. 3d at 454; *Sorenson v. Fio Rito* (1980), 90 Ill. App. 3d 368, 372), it cannot be said that GTE's negligence is tantamount to the *pro se* plaintiff's intentional wrongful conduct in *Harvey*, or that the Diamonds' claimed damages here were losses "directly caused by" GTE's negligence. The Diamonds' were charged with their own acts of negligence in the underlying cause, and, in reasonable anticipation of liability, they chose to hire their own personal counsel, to settle with Signal Delivery Service, and to lay their $300,000 liability insurance limit on the line in a pretty good gamble that they would not be the *only* defendants found liable. The "damages" incurred were the result of the decisions made by the Diamonds as to how best to defend themselves in the underlying actions.

We conclude the court did not err in dismissing counts IV and VIII.

Finally, we find meritless the Diamonds' contention that the court erred in dismissing all counts with prejudice without hearing any evidence. *Muhlbauer v. Kruzel* (1968), 39 Ill. 2d 226, does not support a finding that the court so erred.

The judgment of the circuit court of Kane County is affirmed.

Affirmed.

DUNN and GEIGER, JJ., concur.