NO. 4-96-0663

                          IN THE APPELLATE COURT

                                OF ILLINOIS

                              FOURTH DISTRICT

MARGARET GERNAND, HAROLD V. PERRY,      ) Administrative Review

NORMA J. PERRY, SHIRLEY ACTON and       ) of Illinois Commerce

PATSY A. WYMAN and LOREN L. WYMAN,      ) Commission

as Trustees of the Loren L. Wyman       ) No. 95-0237

Revocable Trust,                        )

          Petitioners-Appellants,       ) 

          v.                            ) 

ILLINOIS COMMERCE COMMISSION,           ) 

          Respondent-Appellee,          )

          and                           )

INTER-STATE WATER COMPANY, now          )

CONSUMERS ILLINOIS WATER COMPANY,       )

          Respondent-Appellee.          )

          JUSTICE GREEN delivered the opinion of the court:

          On June 1, 1995, respondent, Inter-State Water Company,

now Consumers Illinois Water Company (CIWC), filed a petition with

respondent, the Illinois Commerce Commission (Commission),

requesting issuance of a certificate of convenience and necessity

under section 8-406 of the Illinois Public Utilities Act (Act) (220

ILCS 5/8-406 (West 1994)), and orders under sections 8-503 and 8-

509 of the Act (220 ILCS 5/8-503, 8-509 (West 1994)) authorizing

CIWC to seek to obtain, by eminent domain, temporary easements for

test-boring surveys to find groundwater, construct test wells,

extract groundwater, and measure the effect of removing groundwater

on the water supply in a rural area of Vermilion County, Illinois.

          The area involved was outside the area served by CIWC and

approximately 15 miles from CIWC's plant in Danville.  Persons

owning land in the areas upon which entry was sought (landowners)

were granted leave to intervene.  On June 26, 1996, a divided

Commission entered an order allowing the petition and on July 17,

1996, denied landowners' application for rehearing.  Acting

pursuant to section 10-201(a) of the Act (220 ILCS 5/10-201(a)

(West 1994)) and Supreme Court Rule 335 (155 Ill. 2d R. 335), the

landowners filed a timely petition for judicial review by this

court.

          On judicial review, the landowners maintain (1) sections

8-406, 8-503, and 8-509 of the Act do not give the Commission

authority to issue the type of order sought here; (2) even if the

Act provided for that type of relief, CIWC did not make the

required proof; (3) the Commission's order violated the state and

federal constitutions; and (4) seismic testing by CIWC in roadways

next to landowners' fields precluded CIWC from being entitled to

the order on review.  The question of whether the Act authorizes

CIWC or other similar utility to obtain an easement for testing

purposes rather than to obtain a permanent right to drill for and

obtain water for use by its customers is a close and complicated

question.  We conclude the Act does so provide.  We find no merit

in the landowners' other claims of error.  We affirm.

          A substantial amount of evidence was presented to the

hearing examiner for the Commission.  Craig Cummings, executive

vice-president and general manager of CIWC, gave the following

explanation of CIWC's request.

          CIWC was seeking relief in this proceeding in an effort

to resolve a public health concern and assure the continued

provision of safe drinking water to the approximately 55,000

residents of the Vermilion County district.  The United States

Environmental Protection Agency determined that at times the

nitrate levels in the water of Lake Vermilion, where the company

obtains its water supply, were excessively high.  In response to

the nitrate problems, the Illinois Environmental Protection Agency

(IEPA) required CIWC to execute a letter of commitment in the

summer of 1992 that it would bring the nitrate levels in the water

it supplies to its customers to the levels that comply with the

federal primary drinking water standards by April 1, 1997. 

Cummings indicated the CIWC was evaluating several options of

complying with its letter of commitment with the IEPA.

          Cummings further explained that those alternatives

included a groundwater blending option, which is the subject matter

of the petition here.  He stated that information from the well-

testing program proposed by CIWC was essential to permit a thorough

evaluation of the groundwater option.  He stated that CIWC,

together with the Illinois State Geological Survey (ISGS) and the

Illinois State Water Survey (ISWS), conducted test-boring surveys

on the west side of Lake Vermilion.  The survey results showed the

finger of the aquifer closest to CIWC's system did not offer a

reliable long-term source of water.  Accordingly, CIWC, in its

consultation with ISGS and ISWS, sought an appropriate alternative. 

CIWC determined that additional tests should be conducted north of

the lake and south of the City of Henning to determine (1) whether

that aquifer there provided an adequate source of supply, and (2),

to minimize costs, how far south production wells could be located.

          Cummings further testified that to evaluate the

feasibility and cost of the proposed groundwater project, CIWC

would be required to enter private property in the agricultural

areas which CIWC, in consultation with ISGS and ISWS, had

identified as being best for the drilling of test wells and other

testing.  He stated that the landowners had refused permission for

CIWC to enter their land and perform the drilling and testing.  He

explained that CIWC would construct temporary wells on some

properties and two-inch piezometers on other properties, all for

the purpose of determining the ground-water supply in the area and

the damage, if any, that withdrawal of substantial quantities of

the water would have on the supply available for the landowners. 

Cummings asserted that without this testing, CIWC could not

completely determine which method of solving the nitrate problems

would be the most cost efficient.

          John Jansen, vice-president of a water resource discovery

and management company, Ted Zorich and Associates, Inc., testified

regarding seismic testing in the area from which he had concluded

that test wells should be dropped on the properties subject to this

petition.  He described the program that would be followed in the

event the requested relief is granted, which would likely consist

of several controlled pumping tests.  He stated that on properties

where wells are not dropped, the two-inch piezometers would be

installed to record the effect of pumping on the overall water

table.  Jansen also stated the temporary wells would be pumped at

a sufficient rate and duration to determine the safe, continuous

yield and boundary condition of the aquifer.  He said if the data

results were favorable, they would be used to design a well field,

project the long-term water levels of the aquifer, and predict the

potential effect of the well field on neighboring wells and surface

water bodies.  Jansen indicated that a capacity of 5 to 7 million

gallons per day would be necessary to supplement the water supply

from Lake Vermilion, and this would require the eventual

installation of approximately five wells with capacities of 1,000

gallons per minute.  

          Jansen testified that the data from the test wells, when

taken in conjunction with regional studies of the ISGS, would

eventually allow the company to select well sites in the deepest

portion of the Danville bedrock valley, which are likely to have

the greatest thickness of Mahomet sand and provide the highest

production capacity with the least impact on surrounding wells.  He

stated that based upon the current knowledge of the aquifer, he did

not believe the operation of the test wells would have any

significant impact upon existing wells.  He also testified that if

any adverse effects were detected, the pumping test at the site

would be discontinued, and that this was one of the purposes of the

proposed test wells.

          Roy King, an employee of the Commission as a utility

engineer in the water/sewer program, testified that testing was

needed and recommended to allow CIWC to reduce the nitrate level in

its water supply as mandated by IEPA.  It was his understanding

that to reduce the nitrate levels in the water supply required

either a new source of supply, treatment of the existing source, or

some kind of combination, such as an alternative supply, which

could be blended with the existing supply.  He noted that following

the filing of the instant petition, CIWC had entered into a

contract with CSX Transportation, Inc. (CSX), to drill five test

wells along its railroad right-of-way.  He believed the need for

the sites requested in the petition remained, despite the CSX

sites, because additional observation points were necessary to

determine the effect of pumping water from the aquifer and the

resulting impact on existing wells.  In addition, King questioned

the viability of operating permanent wells on CSX's right-of-way.

          Harold Perry and Gordon Alexander, both of whom are

active in the Vermilion County agricultural community, testified in

opposition to the petition.  Alexander indicated his belief that

water from abandoned strip mine pits located west of Danville and

in close proximity to the company's pumping station could be

utilized as an additional source of water for Lake Vermilion. 

Alexander also indicated that other acceptable treatment methods

such as ion exchange, reverse osmosis, and charcoal filtration

should be considered.  Finally, Alexander expressed his belief that

a great potential existed for area wells to be adversely affected

to the point of going dry, or having their output severely

curtailed if massive amounts of groundwater were removed from the

area.  He based this belief upon his understanding that the area

upon which the wells are sought to be placed are located upon only

a finger of the Mahomet aquifer, making the amount of water

available smaller than other areas located over the main channel of

the aquifer.  

          Perry joined in Alexander's concerns that massive amounts

of ground-water removal from their private property would cause

their wells to dry up or severely curtail their water supply.  He

testified that the CSX sites were sufficient to allow all the

requisite testing without recourse to the landowners' private

property.  He was unconvinced of the nitrate problems with Lake

Vermilion since there had been no nitrate alerts for 3½ years at

that time.  He believed the CIWC wanted to expand its water supply

at the expense of local residents' wells to allow it to serve

additional customers and not to correct nitrate problems with Lake

Vermilion.  

          Brett Carney, an employee of Hanson Engineers, Inc.

(Hanson), and a certified professional geologist and

hydrogeologist, also testified on behalf of the landowners.  He

testified that he was unable to determine, from a review of the

materials submitted by CIWC in support of the petition, whether

testing on the landowners' properties was a "necessity" or whether

the CSX sites alone would be sufficient to provide CIWC with

adequate information concerning the nature of the aquifer.  He

indicated the CSX sites were in close proximity to the sites

requested in the petition and "could yield valuable information." 

Carney also indicated the company could place piezometers along

county roads to use in conjunction with the CSX sites to determine

if the CSX sites alone would provide enough information to map and

evaluate the aquifer.

          Carney testified since the details of the CIWC

investigation were unclear, it was difficult for him to evaluate

the feasibility of the project.  He concluded that given the lack

of specific details for the investigation proposed by CIWC, he saw

no reason why its present plan could not be implemented on the

existing CSX railroad sites.

          Deborah Ramsey, a senior chemical engineer/process

engineer for Hanson, testified for the landowners.  She said she

reviewed a document entitled "February 1989 Update for Proposed

Water Treatment Facilities for Inter-State Water Company by Himmel

and Oliver."  The 1989 report evaluates three water treatment

alternatives for nitrate removal:  reverse osmosis, ion exchange,

and biological treatment.  She said the report rejects biological

treatment due to start-up time frame problems and finds ion

exchange more cost effective than reverse osmosis.  The report

discusses dilution options, finding the development of a well field

more cost effective than the construction of a second reservoir. 

Following Ramsey's review of the 1989 report and the testimony of

Cummings, she concluded that while the company's conclusion may be

correct, the information provided is not sufficient for the

formation of an opinion as to whether the well-field proposal is

the most cost-effective alternative.

          Ramsey went on to testify that, in her opinion, some type

of watershed management program should be instituted.  She said

this would entail working with the local agricultural community in

the reservoir watershed to try to reduce nitrate runoff into Lake

Vermilion.  She said the farmers would be encouraged to reduce the

amount of fertilizer applied, change the method of application, and

create grassed waterways and drainageways to reduce the levels of

nitrate and runoff.

          Cummings testified in rebuttal, responding to the

testimony of the witnesses for the landowners.  He stated:  (1)

although the information from the CSX sites is helpful, it is not

enough to make an adequate evaluation of the groundwater resources

in the area; (2) one such site was not usable for a well, and none

would make good places for permanent wells; (3) abandoned strip

mine pits would be inadequate sources of additional water because

of uncertain volume and poor quality due to mineral buildup from

the mine tailings, as well as possible high nitrate levels from the

runoff of nearby farmlands, or even possible septic systems

discharging into the open pit; (4) the ion-exchange process had

been tested at the Danville plant and problems arose concerning the

disposal of the backwash at a reasonable cost as the Danville

Sanitary District had refused to accept this substance; and (5) the

engineering aspect of incorporating the procedure into the existing

system was uncertain.

          Cummings noted that CIWC had not yet determined the

option it would select to consider the nitrate problem, but the

results from the testing, which is subject to this case, would be

very helpful in making the decision.  Cummings further pointed out

that CIWC was in no position to implement a watershed management

program to control the nitrate level in Lake Vermilion, as it

controlled less than 1% of the watershed and had no governmental

power over the watershed, which extends into Indiana.  He also

noted that the installation of piezometers along county roads could

interfere unduly with the normal flow of traffic.  He responded to

Perry's concern about damage to the local water supply by pointing

out that the test wells would not pump out a large quantity of

water, and that the avoidance of imposing dry wells on the

landowners was a primary reason for testing before permanent wells

were sunk.

          Jansen testified in rebuttal that railroad right-of-ways

would be bad places for any kind of wells because of the limited

space available and the danger of an entire well field being

contaminated by a chemical spill from a railroad car near a well. 

The rebuttal testimony of King supported that of Cummings and

Jansen in regard to the lack of feasibility of using only railroad

right-of-ways for test wells.

          After the landowners refused CIWC permission to enter

their land for the purpose of doing the proposed testing, CIWC

filed a petition in the circuit court of Vermilion County seeking

an order authorizing entry of the land for test purposes pursuant

to section 8-510 of the Act (220 ILCS 5/8-510 (West 1994)), which

provides that utilities with a certificate of convenience and

necessity may enter the lands of others under certain conditions

"[f]or the purpose of making land surveys."  220 ILCS 5/8-10 (West

1994).  The circuit court of Vermilion County denied that request,

ruling that the testing procedures requested here go beyond the

making of a survey.

          The instant proceeding has been brought to obtain

authority to enter landowners' property for a temporary easement to

drill the test wells and perform the testing procedures.  CIWC

sought the power to condemn under section 8-509 of the Act and a

certificate of convenience and necessity to construct the test

wells and other fixtures necessary to do the testing procedures,

pursuant to section 8-406 of the Act.  Section 8-509 of the Act

states:

               "When necessary for the construction of

          any alterations, additions, extensions or

          improvements ordered or authorized under

          Section 8-503 or 12-218 of this Act, any

          public utility may enter upon, take or damage

          private property in the manner provided for by

          the law of eminent domain."  220 ILCS 5/8-509

          (West 1994).

          Accordingly, CIWC sought authority under section 8-503 of

the Act to construct the temporary test wells and other facilities

necessary for the testing.  Section 8-503 of the Act provides:

               "Whenever the Commission, after a

          hearing, shall find that additions,

          extensions, repairs or improvements to, or

          changes in, the existing plant, equipment,

          apparatus, facilities or other physical

          property of any public utility or of any two

          or more public utilities are necessary and

          ought reasonably to be made or that a new

          structure or structures is or are necessary

          and should be erected, to promote the security

          or convenience of its employees or the public,

          or in any other way to secure adequate service

          or facilities, the Commission shall make and

          serve an order authorizing or directing that

          such additions, extensions, repairs,

          improvements or changes be made, or such

          structure or structures be erected at the

          location, in the manner and within the time

          specified in said order."  220 ILCS 5/8-503

          (West 1994).

          Section 8-406 of the Act, which provides for a

certificate of convenience and necessity, states, in part, that the

Commission may issue a certificate to a public utility to begin the

construction of any new plant, equipment, property or facility upon

a showing by the utility of the following relevant factors:  (1)

the proposed construction is necessary to provide adequate,

reliable and efficient service to its customers and is the least-

cost means of satisfying the service needs of its customers; (2)

the utility is capable of efficiently managing and supervising the

construction process and has taken sufficient action to ensure

adequate and efficient construction and supervision thereof; and

(3) the utility is capable of financing the proposed construction

without significant adverse financial consequences for the utility

or its customers.  

          The landowners' theory that the Commission had no

authority under sections 8-509, 8-503, and 8-406 of the Act to

grant the relief requested begins with the contention that no

statutory authority for a utility to drill for water was cited

before the Commission.  The short answer to that assertion comes

from sections 11-138-1 and 11-138-2 of the Illinois Municipal Code

(Code) (65 ILCS 5/11-138-1, 11-138-2 (West 1994)).  Section 11-138-

1 of the Code permits a water company such as CIWC to "locate its

source of supply at, or change its source of supply to, a point not

more than 20 miles beyond the corporate limits of the municipality"

served and "take and damage private property" to do so.  65 ILCS

5/11-138-1 (West 1994).

          Section 11-138-2 of the Code authorizes proceeding in

eminent domain to do so.  The landowners assert that we should not

consider these statutory provisions because they were not presented

to the Commission.  However, we conclude that the rule that permits

this court to search the record to affirm, regardless of whether it

was relied upon by the trial court and regardless of whether the

reason given was correct (Material Service Corp. v. Department of

Revenue, 98 Ill. 2d 382, 387, 457 N.E.2d 9, 12 (1983)), is

applicable to this administrative review.

          More importantly, the landowners contend that sections 

8-406, 8-503, and 8-509 of the Act seem to refer only to takings of

property for permanent facilities and not for temporary easements

for testing purposes as sought here.  They call attention to the

reference to "alterations, additions, extensions or improvements"

described in section 8-509 of the Act and the "extensions, repairs

or improvements to, or changes in, the existing plant, equipment,

apparatus, facilities or other physical property" referred to in

section 8-503 of the Act.  The landowners also point to somewhat

similar language in section 8-406 of the Act.  

          The landowners note a rule that any statutory authority

which purports to permit agents of utilities to enter private land

is in derogation of the landowners' common law rights should be

strictly construed.  Diamond v. General Telephone Co., 211 Ill.

App. 3d 37, 49, 569 N.E.2d 1263, 1270 (1991).  The landowners

conclude that  even a moderately  strict construction of  sections 

8-406, 8-503, and 8-509 of the Act negates any statutory authority

for the ruling provided by CIWC.  They maintain the Commission

should have dismissed CIWC's petition for lack of authority to

proceed.

          We recognize the lack of any clear express authority

under the Act for the Commission to give a utility authority to

condemn for temporary easements to make tests to determine whether

permanent interests in property should later be condemned. 

However, in interpreting the somewhat uncertain legislation, we

give some deference to the Commission, which is the agency charged

with its administration.  See Illinois Consolidated Telephone Co.

v. Illinois Commerce Comm'n, 95 Ill. 2d 142, 152, 447 N.E.2d 295,

300 (1983); Adams v. Jewel Cos., 63 Ill. 2d 336, 344-45, 348 N.E.2d

161, 165 (1976).  The Commission had no difficulty in holding that

it had statutory authority to issue a certificate of convenience

and necessity for authorizing condemnation for the proposed

temporary testing project.  

          We also note that in Wilcox v. Illinois Commerce Comm'n,

23 Ill. 2d 432, 439-40, 178 N.E.2d 873, 877 (1961), the Supreme

Court of Illinois upheld a Commission's order issued under "An Act

concerning the use of eminent domain ***" (Gas Act) (Ill. Rev.

Stat. 1959, ch. 104, par. 104 et seq.) permitting condemnation for

underground gas storage even though the project was on an

"experimental basis."  Nothing in that legislation specifically

authorized condemnation for temporary purposes.  Most condemnations

authorized under the Act are undoubtedly for easements for electric

power lines or gas and water mains.  The need to condemn to run

test wells in regard to underground sources of water would not

arise as often and may well explain the lack of precedent here. 

The testing in regard to the gas storage dome in Wilcox is similar

to the testing proposed here.

          Considering the deference we give to the Commission, the

construction the supreme court gave to the Gas Act and the common

sense of permitting condemnation to test the quality of a water

source before making permanent facilities, we hold that the

temporary testing wells and the installation of the piezometers and

other testing devices testified about are proposed "additions"

within the meaning of sections 8-503 and 8-509 of the Act, which

could be found to be "necessary" for CIWC to "secure adequate

service" to its customers by enabling CIWC to determine the best

method to reduce the nitrate content of its water.  In much the

same manner, these wells and other testing devices could be found

to be facilities necessary for efficient low-cost service, which

CIWC was capable of constructing and which was economically

feasible, all within the meaning of section 8-406 of the Act.  The

Commission properly denied landowners' motion to dismiss CIWC's

petition for failure to set forth grounds for relief.

          We can properly overturn the Commission's decision for

lack of proof only if that decision is not supported by substantial

evidence.  See Business & Professional People for the Public

Interest v. Illinois Commerce Comm'n, 136 Ill. 2d 192, 204, 555

N.E.2d 693, 698 (1989); People ex rel. Hartigan v. Illinois

Commerce Comm'n, 117 Ill. 2d 120, 142, 510 N.E.2d 865, 874 (1987). 

CIWC's proof here clearly meets that standard of substance.  The

Commission could find from the testing that CIWC was not likely to

be able to put into operation a scheme whereby the runoff into Lake

Vermilion would have a reduced content of nitrates and that the use

of water in abandoned open mine pits would not be favorable.  The

Commission could also properly find that the use of chemicals to

remove nitrates in the water supply lacked feasibility.

          From time to time, both before the Commission and here,

the landowners' argument has confused the question of whether

drilling of test wells to determine the feasibility of removing

water from the vicinity of their land with the question of whether

the permanent wells should ultimately be drilled.  The evidence

permitted the Commission to conclude that no great damage was

likely to result to the landowners from the drilling of the

temporary wells, and that these wells would enhance the ability to

make a subsequent decision as to whether permanent wells should be

placed there.  We can understand the concern of the landowners as

to preserving their water supply, but if a subsequent condemnation

suit is brought to condemn for permanent wells, they will have more

information as to the danger involved than is now available.

          In regard to both the right to condemn and the issuance

of the certificate of convenience and necessity, the necessity for

the testing is a significant issue.  In that regard, the

"necessity" does not require that element in issue be

"indispensably requisite" but only needful and useful to the

public.  Eagle Bus Lines, Inc. v. Illinois Commerce Comm'n, 3 Ill.

2d 66, 78, 119 N.E.2d 915, 922 (1954).  The information presented

as to the feasibility of effectively obtaining water to dilute the

nitrates in the utility's major source of supply meets that

requirement.

          More specifically, section 8-406 of the Act requires that

for issuance of a certificate of convenience and necessity, the

Commission must not only find the necessity for the construction,

but also that it is the "least-cost means of satisfying the service

needs of its customers," and that the utility is capable of

managing the construction and financially able to do so.  220 ILCS

5/8-406(b) (West 1994).  The landowners contend that proof of the

"least-cost means" was not made here.  No evidence was presented as

to the cost of the temporary wells or the other testing devices. 

However, the Commission could conclude from the evidence that the

proposed method of adding well water to the main source of supply

appeared to be the only feasible method of proceeding and was,

thus, the "least-cost means."

          The landowners argue that the Commission's order violates

the state and federal constitutional provisions against the public

taking of private property.  U.S. Const., amend. V; Ill. Const.

1970, art. I, §15.  Their position is apparently based upon a

theory that the order entitling CIWC to seek easements was, in

fact, an order permitting seeking of a permanent taking of the land

on which the wells were located, along with a permanent easement of

access to the wells for piping therefrom.  Such is simply not so. 

Further proceedings before the Commission would be required before

proceedings under eminent domain could be started for the purpose

of obtaining permanent rights.  The information sought to be gained

by the granting of a temporary easement may be such as to be

protection to the landowners.  The case of Hendler v. United

States, 952 F.2d 1364 (Fed. Cir. 1991), relied upon by the

landowners in contending the Commission's order is in violation of

their constitutional rights, is authority for the legal theory that

the temporary easements sought here are a taking requiring just

compensation to the landowners.  That just compensation would be

granted to the landowners in the subsequent eminent domain

proceeding ordered by the Commission.

          Evidence presented at the hearing before the Commission

indicated that agents of CIWC had conducted some seismic testing on

the edge of roads by property of the landowners in order to obtain

data relevant to the availability of underground water in those

spots.  We are aware of the interest of landowners in one-half of

the road adjacent to their land.  See Thompson v. Maloney, 199 Ill.

276, 285-90, 65 N.E. 236, 238-40 (1902).  Landowners do not present

a clear argument as to whatever relief they may be entitled for

whatever trespassing might have resulted.  We know of no rule which

would require suppression of any information obtained thereby, and

the instant proceeding is not one in which any compensation could

be awarded for any tort that might have been committed.

          Accordingly, we affirm the Commission's order on review.

          Affirmed.

          STEIGMANN, P.J., and KNECHT, J., concur.